Ames *v.* Trenton Brewing Co.

HELEN AMES

. 56 309
s57 347
56 309
59 545

*v.*

THE TRENTON BREWING COMPANY et al.

[Filed November 23d, 1897.]

1. Goods were delivered under a lease with a privilege of purchasing them at a named price; subsequently the lessee was enabled to buy them outright, he agreeing that a mortgage should be given to secure the purchase-money advanced by the mortgagee, and such a mortgage was given. The goods were placed on premises which had been demised to the mortgagor by a lease containing a covenant that "improvements made upon the said premises" the lessee should leave undisturbed for the benefit of the premises without charge.— *Held*, the title of the mortgagor to the goods was in the nature of a transitory seizin, and the purchase-money mortgage preceded any right of the lessor under the covenant in the lease of the premises.

2. Under such a covenant the improvements to be left must be improvements of the realty itself.

3. To become such an improvement the personalty must be converted into realty, and to be so converted it must have been actually annexed to the realty with an intention to make it a part of the demised premises.

4. An attachment of ornamental bars, complete in themselves when they were brought on the premises, to the floor and wall of a saloon, by adjustable screws and angle and stay-irons, for the sole purpose of retaining them in their places, and of a beer pump and accompanying pipes to pump beer from a cellar, is not such an annexation as will convert this personalty into realty, so as to become an improvement of the demised premises.

5. The fact that the lessor before and at the time of the purchase of these articles, and when he brought them on the demised premises, always treated them as personalty, and to obtain the purchase-money had agreed to mortgage them as chattels, and did so mortgage them, is an indication that he did not intend the articles named to become part of the realty.

On bill and final hearing.

This is a bill filed by the complainant, the owner of a beer saloon, at the northwest corner of Fourth and Market streets, in Camden, against the Trenton Brewing Company, a chattel

mortgagee, claiming a lien upon certain equipment of that saloon, and August Weber, the lessee of the saloon and mortgagor in the chattel mortgage, and seeks to enforce a covenant not to remove improvements, &c., from the saloon, and to obtain an injunction to restrain such removal, or any sale or other disposition of them. On the bill and affidavits annexed, a rule to show cause was allowed why an injunction should not issue restraining removal, &c., and further depositions were taken, upon notice and cross-examination. As the bill only seeks an injunction, the parties have by stipulation agreed that it should be heard as on final hearing upon the affidavits and depositions already submitted.

The whole controversy turns upon the operation of a covenant contained in a lease made on the 18th day of August, 1894, by the complainant to the defendant August Weber, demising the saloon, its cellar and a part of the yard attached, for the term of one year, at the yearly rental of $480. The lessee covenants that he will not underlet, nor permit anyone to occupy nor use the premises for any other purpose than that of a saloon, nor " make or suffer to be made any alteration therein without the written consent of the said party of the first part." And also covenants that if the rent be unpaid, the lease shall be void, and that the lessor may enter, &c. It was further agreed by the lessee

" that in case of any alterations, repairs or improvements made upon the said premises, he shall leave the same undisturbed at the expiration of his said term, for the benefit of the said premises and without charge therefor."

Under this lease from the complainant, Weber went into possession of the demised premises. He shortly afterwards took a partner, Mr. Abendroth, and they did business under the name of Weber & Abendroth. About the 1st day of August, 1896, this firm leased from Lewis & Brother, manufacturers of bar fixtures and furniture, of Philadelphia, a complete set of bar furniture, consisting of a back bar with mirrors and marble trimmings, and a front bar or counter also with mirrors and marble trimmings, shelvings, a screen, partitions and swinging

doors, fixing a purchase price of the goods at $1,000. In the lease between Lewis & Brother and the saloon-keepers was inserted this clause :

"The lessee agrees that the said furniture shall not be attached or nailed to the building in which they are to be used, but shall be so placed and arranged as in nowise to be connected with the freehold."

Mr. Weber afterwards called on Lewis & Brother, and stated that he would prefer to purchase the furniture for cash ; that the Trenton Brewing Company had agreed to advance them $1,000, and to take as security a chattel mortgage on the bar furniture. The articles named were delivered on the 5th day of September, 1894, at the saloon, under the lease from Lewis & Brother ; payment was made in part on that day. The parties afterwards concluded to purchase outright, and on the 10th of October, 1894, the balance of the full price of the purchase-money was paid to Lewis & Brother, who gave to the manager of the Trenton Brewing Company, at the time when the company advanced the $1,000 to Weber & Abendroth, to enable them to make the purchase, a full description of the bar furniture.

The character of the articles furnished is described by their manufacturers to have been entirely finished and complete in their wareroom in Philadelphia, and their manager and the carpenter who put them in support this statement and explain that they were cut into sections and refitted together, because of the inconvenience of moving them in the whole pieces as they stood in the wareroom. The only portion of the cabinet work which appears to have been specially adjusted to the building was some panel work which extended from the Market street side back to the end of the bar. Both the front and back bar and their equipment were complete and finished without this end, which was put in on the premises, at the request of Mr. Weber, to close that end. The bars were equipped for the drawing and selling of beer, by a beer pump, with pipe and spigots.

The other articles in dispute consist of two chandeliers, gas fixtures and electric-light globes. These were attached to the

gas pipes on the premises by Weber & Abendroth, in the ordinary manner, for the purpose of lighting the saloon.

The saloon-keepers had not the funds to pay for the two bars and their appurtenances. The Trenton Brewing Company agreed to lend $1,000 to enable the lessees to purchase them, and it was agreed that they should secure its payment by a chattel mortgage on the articles when purchased. The attorney of that company came to Camden, examined the front and back bar and partition screens, and found them all movable and unattached to the realty; he also examined the records to ascertain whether any previous liens had been fixed upon them, and finding none the chattel mortgage under which the Trenton Brewing Company claims was, on the 10th day of October, 1894, made and recorded, and the $1,000 paid over by the Trenton Brewing Company to the mortgagors, and was used by them in paying for the furniture. The articles included in the chattel mortgage were one cherry back bar, with marble trimmings and mirrors, shelving, door, fancy bottles, stock bottles, and bar appurtenances, beer pumps, pipes and spigots; one front bar (cherry), marble trimmings and mirrors, one cherry partition with mirrors and swinging doors, four tables, twelve chairs, spittoons, one lunch table, two chandeliers, gas and electric-light globes, one clock, oilcloth and matting, and one statue entitled "after the bath."

In 1896 the saloon-keepers had defaulted in the payment of their rent and in payment of the mortgage debt, and in December of that year the Trenton Brewing Company took possession of the various articles named in the chattel mortgage and advertised them for sale. The complainant then filed this bill to restrain this sale, alleging that the articles named were alterations, repairs and improvements upon the demised premises, and that they "belonged to and became part of the said premises by virtue of the terms of the covenant herein set forth and mentioned."

After the lease was made Mr. Weber, the lessee, papered the saloon-room, put in a urinal, mended some places in the floor, and asked for consent (under the provisions in the lease that no

alterations should be made without consent) to build an additional room for a pool-room in that portion of the yard demised to him. No response was made by the lessor, and the tenant erected this additional room without any consent.

These items would hardly be deemed alterations, as they left the original premises unchanged as they found them, but they were added to those premises in a permanent manner, and were therefore more in the nature of improvements. No question has been raised as to these, and they have no other relation to the dispute than to support the claim that the conduct of the tenant in permanently attaching these things to the realty was in recognition and satisfaction of the agreement to leave the improvements upon the premises, and in contrast with his action relative to the articles in dispute which he mortgaged as chattels, and which it is insisted never were attached to nor intended to be part of the demised premises.

*Messrs. Gilbert & Atkinson,* for the complainant.

*Mr. John G. Horner* and *Mr. John T. Van Cleef,* for the Trenton Brewing Company.

GREY, V. C.

It appears to be undisputed that coincidently with the change from an agreement to lease the bars and cabinet work to the mortgagors, to the making of an absolute sale to them for cash, there was also an arrangement that the whole or a considerable part of the purchase-money should be advanced by the defendant the Trenton Brewing Company, which it was agreed should be secured by a mortgage upon the articles sold to the mortgagors. This proposition was indeed the occasion of the change from the plan to lease to that finally adopted of an absolute sale, and the Trenton Brewing Company's money was so obtained and used, without any knowledge on its part that the lease from the complainant contained the provision on which she based her claim. The money of the Trenton Brewing Company was thus made the means whereby the title to those

articles was obtained to be put in the mortgagors, and the first object in putting this title in them seems to have been to enable them to secure the payment of the Trenton Brewing Company's money by making the chattel mortgage in question. The mortgagors were substantially in the position of those to whom a title is given upon an understanding that it shall be disposed of in a certain manner. Their interest is, as to the thing agreed to be done, merely a transitory holding, and is not subject to the charges which ordinarily attend upon the vesting of title to property. Even in the law courts a transitory seizin will not support a right to dower in the wife of the grantee. Where the grantee takes a conveyance in fee, and at the same time mortgages the land to secure the purchase-money in whole or in part to the grantor, or to some other person, dower cannot be claimed against the mortgage. *Griggs* v. *Smith, 7 Halst. 25.* So, where a mechanic erects a building on land by contract with a person having a covenant for its conveyance, and the covenantee afterwards receives a deed, but at the same time mortgages it to a third person who advanced the purchase-money, it is held that no mechanics' lien attaches. *Thaxter* v. *Williams, 14 Pick. 54; Mackintosh* v. *Thurston, 10 C. E. Gr. 242.* There appears. to have been, in the case under consideration, a delay of several weeks between the time when the goods were delivered on the premises under the lease, and the change to a sale, and the actual making of the chattel mortgage. But previous to the delivery under the sale the brewing company had agreed to make the advancement upon the security of the chattel mortgage, and this agreement and advancement were the means whereby the goods were obtained to be delivered as sold.

The principle under which, in a court of equity, a purchase-money mortgage is given precedence is not dependent upon the instant carrying into effect of the agreement to give the mortgage, provided no superior equities have intervened during the period of delay. The saloon-keepers were for a time in possession of the articles named under the lease, with an apparently uncharged title, but this fact was not acted upon by the complainant in any way. She claims the articles not under the lease

but under the subsequent sale to the mortgagors.   The mortgagee parted with its money for the purpose of enabling the purchase to be made, and on the assurance that it should have the mortgage as security for its payment.   The mortgagors received the title upon this agreement, and their holding was in the nature of a trust to carry the agreement into effect, and had they refused they could have been compelled in equity to make the mortgage.

The brewing company's mortgage is a chattel mortgage. When it was given the goods named had been brought upon the demised premises.   To be effectual as a chattel mortgage it must appear that the articles named in it were chattels at the time the mortgage was given and had not become a part of the demised premises.

The testimony of the witness Van Cleef, who prepared the chattel mortgage, is that at the time it was executed he

"examined the front and back bar and partition screen and found them all movable and in nowise attached to the realty, resting upon the floor of the saloon as any other piece of furniture would and as did the tables and chairs in the said saloon."

No other witness testified as to the relation of these articles to the realty at the time the mortgage was executed, nor do any define with precision the time when the attachments were applied.   If it were the actual condition, at the time the chattel mortgage was given, that there was no attachment whatsoever of the articles in dispute to the realty for any purpose, their subsequent attachment by the mortgagor tenant could at most only add to the realty the interest which the mortgagor tenant had in them—that is, his equity of redemption.   *Campbell* v. *Roddy, 17 Stew. Eq. 251.*   And even where the chattel mortgagee took his mortgage knowing the goods were to be annexed to the realty, if the detachment of the annexed articles will occasion no substantial damage he will be protected as against a previous real estate mortgagee, so far as his protection will not diminish the security held by the real estate mortgagee before the goods were annexed.   *Campbell* v. *Roddy, 17 Stew. Eq. 253.*

In cases of this character the courts are less favorable to a construction that there has been a conversion of the chattel into realty than when it is made by a mortgagee. *Blancke* v. *Rogers, 11 C. E. Gr. 566.* In this case there is no pretence that the chattel mortgagee knew that there was any intention to annex the articles to the realty, so that its equity is even stronger than that in the *Campbell Case* above cited.

I prefer not to rest the case upon this limited view and will consider all the points presented by the pleadings and proofs and discussed in the arguments of counsel. The complainant, by her bill, states her equity to be that the articles constituting the bars and beer-supplying apparatus became and were in fact part of the demised premises under the terms of that provision in the lease which declares that in case any alterations, repairs or improvements were made upon the premises they should be left undisturbed at the expiration of the term. It becomes a question of the first importance, in the further consideration of this case, to ascertain the construction of this contract as applied to the circumstances of this case. It is not contended by the lessor complainant that the articles claimed to have become part of the realty are either alterations or repairs of the premises. The lessee did not change or alter the premises by taking away anything that was there when the lease was made and putting in its place any of the articles in question. Nor were the latter supplied as repairs of any worn-out or injured part of the demised premises. The complainant contends that the bars and beer apparatus were improvements within the meaning of the clause referred to, and that under its operation they have become part of the real estate demised. I think there is a clear distinction between an improvement upon lands which from its very nature becomes a part of the realty, as a house built by a trespasser upon the lands of another, and an apparent addition to realty which retains some of the essential incidents of a chattel though annexed to realty. Fixtures are all within this latter class, and as to such articles inquiry is permitted to ascertain whether the particular thing in question remains a chattel or has become real estate. The word " improvements " used in the

lease is undoubtedly one of wide signification. I have read with interest the cases to which the counsel of the complainant has referred me as to the various structures which have been held to be included in this term. There is, I observe, one characteristic which attends upon all of them, from the paint put upon a house to the reconstruction of a wharf. The thing done which is held to be an improvement is done to the realty. The word itself conveys this meaning. In order that there might be an improvement there must previously have been something to be improved. In the case before me this was the demised premises. The improvement consisted in the amelioration or bettering of those premises. The provision in the lease which the complainant relies upon expressly defines the word to have this characteristic, for it declares that it is "improvements made upon the premises" which shall be left. The improvements, to be within the provision, must, when made, savor of the realty. The association of the words in the clause of the covenant shows this to be the true meaning. It was "alterations, repairs or improvements made upon the premises" which should be left. That is, if the premises should be altered, as by opening the wall and placing a window, the window should remain. If they should be repaired, as by hanging a new door in place of a broken one, the new door should be left. I think the improvements must also have been improvements of the demised premises, so that the condition and value of the premises as realty were improved, and that the word did not include articles which were in their nature chattels which had not been subjected by the parties to any action which converted them into realty. The covenant did not refer to improvements brought upon or placed in the demised premises. It was improvements made of the premises themselves which were agreed to be left. The complainant's counsel asked several witnesses whether the disputed articles were not improvements of the premises, and whether if they were taken away the premises would not be less valuable, and has advanced some argument upon the theory indicated by these questions. The true inquiry is not whether the presence of these things is an improvement of the place, in the general

sense of the questions asked. The presence in the saloon of the bars and their equipment is an improvement in the same sense that the room is improved by the presence of the chairs, tables and carpets, &c., which are in the chattel mortgage but are not claimed under the covenant. Such things are improvements to the appearance of the place, but none of them can properly be deemed to be of that fixed character which is necessary in order to make them improvements of the real estate or its appurtenances. I think it must be held that the essence of the covenant is that the improvements shall be of the demised premises. Whether they were or were not improvements in the sense that they were betterings of the realty must depend upon their essential nature and the action and intention of the lessee in relating them to the demised premises; the opinions of the witnesses as to the result are of little weight in the matter.

The latest exposition of the law by the court of errors upon the kindred subject of the lien of a real estate mortgage upon articles having some of the characteristics of chattels, is to be found in the case of *Feder* v. *Van Winkle, 8 Dick. Ch. Rep. 372.* The three rules of guidance to determine what in such a case the lien of a real estate mortgage covered, are there restated thus: First, that the articles must be actually annexed to the realty; second, they must be applied to the purpose which that part of the realty to which they were annexed was appropriated; third, they must be annexed with the intention to make them a permanent accession to the freehold. I think the first and third of these rules are aids in this case in seeking to ascertain the operation of the covenant in the lease upon the disputed articles. To constitute an improvement made upon the premises under the terms of this lease, it must have been actually annexed to the realty and intended to be a permanent accession to the freehold. The second rule is not, in my view, applicable to the case under consideration, because if there was any actual annexation to the premises, which was intended to become part of the realty, it must, under the agreement, be left, whether it was applied to the uses of the realty to which it was attached or not.

Accepting this construction of the terms of the lease, the questions to be determined are—

*First.* Were the articles in question actually annexed to the realty ?

*Second.* Was that annexation intended to be a permanent accession to the freehold ?

First, as to the annexation to the freehold.   There must have been some sort of actual annexation.   The manner of attachment may of itself be of so permanent a nature as to be almost conclusive evidence of a purpose permanently to incorporate the chattel with the realty, or it may be of such an adjustable character as to rebut that conclusion and support other evidence of the intention of the party not to incorporate the chattel with the realty.   In this case the bars and their equipment, the partitions, doors and mirrors, and the beer pump and its attendant pipes were each and all perfect and complete in themselves for the uses to which they were adapted before they were brought upon the demised premises.   The length of one partition at the back end of the bars and the length of the beer pipes seem to be the only things which required adjustment to fit them into the demised premises.   They were all stock articles, capable of being put into any saloon large enough to hold them.   None were brought upon the premises as material to be used for the construction of an improvement of the demised premises.   When they came thus complete and ready for use, it was found that the front bar, which, in its use, was likely to be jostled by men leaning on it, and the back bar, which ran up to so considerable a height that it might readily topple over, needed to be stayed in their places.   It was also found that the pipes to and from the beer pump, and to supply water and carry off waste water, required holes to be cut in the floor corresponding to the position in which they were placed.   For the purpose of preventing the front bar from being shaken or pushed out of its place, it was made firm by the use of several angle-irons, one member of which was screwed to the bar and the other to the floor.   The back bar was also prevented from falling over by screwing it to stay-irons which were driven into the wall.   Pipe holes, which

were from seven-eighths of an inch to an inch and a half in diameter, were cut into the floor to let the pipes through. All these pipes were attached to the bars, and, except the waste-water pipe, were coupled by adjustable joints. When the bars had been put up they were held in their place by the screws in the angle-irons and stay-irons. If the screws were drawn the angle-irons would have no attachment to anything, and the stay-irons would remain sticking in the wall. If the beer pipes were uncoupled, the pump and pipes would be removable, leaving only the small pipe holes as an evidence that the pipes had ever been there. When thus disconnected the bars and their equipment, and the beer pump and its accompanying pipes, would be in substantially the same condition that they were when brought upon the premises, and capable of being placed in any other saloon large enough to hold them. This last characteristic is not conclusive as to the quality of the articles in question, but was held in the case of *Feder* v. *Van Winkle* to be a circumstance worthy of consideration. The demised premises would also have indicated no change from that shown before the disputed articles were placed there, save the several small pipe holes in the floor and the presence of the stay-irons sticking in the wall. The stopping of these small holes and the tapping and drawing of these stay-irons would absolutely restore the premises to their original condition, so far as any fastenings of the disputed articles changed them, and these restorations are, in my view, matters of so trifling a character that the necessity to make them cannot be appealed to as evidence of a purpose permanently to annex these articles to the premises. There was proof that, in making a trap-doorway into the cellar, several joists had been cut, but the cellarway has no relation to the disputed articles. The complainant's contention is that the character of the annexation of the articles in dispute is of itself sufficient to show their actual incorporation into the realty, as effectually as the additional pool-room built by the lessee, or the painting or papering of the walls done by him, have become part of the demised premises. The impression I have received from the proofs is that the actual fastening of these articles has been shown to have

been made solely because without support the front bar might be jostled out of place and the back bar toppled over. If such an annexation should be held to be sufficient to convert them from chattels into realty, their proper classification would seem to depend upon the breadth of the base or the height of the structure. If the base of the article were so broad that it did not need screwing to the floor, or the height were so low that it did not require to be stayed by the wall, it would never be so fastened and would remain a chattel, but if it had a narrow base, or were high enough to overset easily, then it must be fastened and would become realty. Whether it should be personal or realty would thus depend not upon the intention of the party that it should become realty, and his acts in accordance therewith, but upon the casual necessities attendant upon keeping a structure, complete in itself, in place, I think this case is fairly within the principles expounded by the unanimous vote of the court of errors in *Blancke* v. *Rogers, 11 C. E. Gr. 563,* where the dispute was between a real estate and a chattel mortgagee. This decision was approved by the same court in *Feder* v. *Van Winkle, supra.* An annexation simply incidental to the staying of the articles, and not constructive or incorporative of those articles into the realty, was held ineffective to bring them under the lien of the real estate mortgage.

I think the method of annexation of these completed stock articles was of such a temporary and adjustable character, under the circumstances proven, that it was not effective as an incident to make them part of the realty.

Upon the second question, of the intention of the lessee to make the chattels a part of the realty, the conduct of the parties interested at the time they acted seems to be wholly irreconcilable with any intent to improve the real estate. It might be that the acts of annexation and conversion were of such a clear and definite character that no room would be left to consider evidence of intention not to convert. The complainant contends that the fact of annexation in this case was of this character. I think the case shows no such physical attachment as of itself works a conversion, and that evidence of the existence of a pur-

21

pose not to attach the articles in dispute as improvements of the demised premises is forceful in support of the claim of the brewing company that they never were so attached as to be improvements. If there was always a clear purpose that the articles should remain chattels, and they were always dealt with as chattels, then they never became improvements of the realty. The cases of fixtures, and others involving the question of sufficient conversion of chattels into realty, all hold that the facts and circumstances of the particular case which may be indicative of the purpose of the lessee or mortgagor or owner, must be considered. The same rule may fairly be applied in ascertaining whether the articles in dispute in this case were improvements of the demised premises. In the later cases much more weight is given to the point of the intention to make the chattel a part of the realty than to the actual mode of annexation. In *Erdman* v. *Moore, 29 Vr. 461,* the late Chief-Justice Beasley held that the articles in dispute in that case could not by reason of their physical connection be deemed to be fixtures, yet when it appeared *aliunde* that there was an intention to make them fixtures this element was held to be controlling.

In the case of *Feder* v. *Van Winkle,* above cited, the court of errors declared that to effect a conversion the intention must exist to incorporate the chattels with the real estate for the uses to which the real estate is appropriated, and there must be the presence of such facts as do not lead to but repel the inference that it is intended to be a temporary annexation. It will be thus seen that the element of intention is the controlling factor in determining whether additions to real estate, which retain apparent indications that they are still personalty, have become incorporated into the realty. Each case must be controlled by the evidence of annexation and intention exhibited in that particular instance; the difficulty arises, as the court in the last-cited case declared, in applying the rule.

In this case there are several undisputed facts which I think show conclusively that the lessee never intended to incorporate any of the articles claimed by the chattel mortgagee as part of, or an improvement upon, the realty. The original purchase of

these articles was effected by means of the loan made to the lessee by the brewing company, upon an assurance given it that it should have the chattel mortgage here in question. This agreement to give the chattel mortgage, and its subsequent performance, show that the lessee deemed the goods mortgaged to be, and intended them to continue to be, personal property. These acts were done by the lessee before the articles in question on the premises became his by purchase, before any dispute had arisen, and before any default in the payment of the rent might have tempted him to deny an intention to annex these things to the freehold. So the mode of annexation of the articles was adjustable and capable of easy disconnection. This mode of attachment required the purchase of special irons and stays which, had there been a purpose permanently to annex, would not have been necessary and would probably have been avoided on the ground of expense and additional labor. The testimony of the lessee mortgagor supports his previous action in giving the chattel mortgage. He testifies that the articles mortgaged never were intended by him to be alterations, repairs or improvements of the demised premises; that on the contrary they were regarded by him as furniture and intended to be taken away when the lessee decided to remove them. Nothing in the case contradicted these proofs, save only the inference sought to be drawn from the mode in which the articles in question are fixed in their places. Had they rested unstayed by their fastenings, there would be no evidence whatever of an intention to make them part of the realty. When all the proofs indicate a positive purpose not to convert these articles into realty, and this one incident is capable of an explanation not inconsistent with the intention not to convert, I think I am bound to hold that the complainant has failed to support her allegation that under the operation of the covenant recited, the articles named have become part of the demised premises. I do not consider that this view conflicts with the principles of the decision of the court of errors in *Feder* v. *Van Winkle*, or of this court in *Lee* v. *Hubschmidt Building Co., 10 Dick. Ch. Rep. 623.* Each of those cases was determined by the special circumstances exhibited in the particular case.

Vice-Chancellor Pitney, in *Lee* v. *Hubschmidt Building Co.*, was of the opinion that the case of *Blancke* v. *Rogers* had been limited by the court of errors in the case of *Feder* v. *Van Winkle*. The court of errors did not overrule or in terms modify *Blancke* v. *Rogers*, and whatever limitation it made of the rules laid down in that case is to be ascertained by an examination of the application of those rules to the circumstances of the later case. In the *Blancke Case* the facts showed that the attachment of the machine in question was made simply to steady it in its place, and I understand the spirit of the decision to be that such an attachment indicated no purpose to make the machine a part of the realty, and this view was not disapproved of in the *Feder Case*. In the latter decision the articles consisted of heavy machines, weighing from four hundred to eight thousand pounds, resting on and fastened to large timbers laid in the earth, some of them on a sub-foundation of concrete, others fastened by bolts and rods let down from the beams and rafters of the building. The court said : " The machinery employed, the mode of its annexation and the manner of its use in connection with the realty as an entirety, indicated not a temporary, but a permanent accession." The machines were shown by the proofs to have become by their attachment a part of the construction of the realty. In the *Lee Case* the facts as to the character of the machinery and its annexation to the realty were substantially the same as in the *Feder Case*, and the vice-chancellor accepted the latter case as controlling the question.

In my view, neither the *Feder Case* nor the *Lee Case* differs from the essential principle declared in the *Blancke Case*. Where the annexation is of such a character as to indicate a purpose to make the chattels part of the realty, as in the *Feder* and *Lee Cases*, they will be held to have become realty. Where the annexation does not indicate such an intent, and is proven to have been made for a different purpose, as in the *Blancke Case* and that now under consideration, the chattels do not become part of the realty. In *Parker* v. *Wulstein, 3 Dick. Ch. Rep. 94*, a lease provided " that all improvements of the building shall belong to the landlord at the expiration of the term." Vice-

Ames v. Trenton Brewing Co.

Chancellor Bird defined the word "improvement" to comprehend everything that tends to add to the value or convenience of a building or place of business. The question in that case arose between landlord and subtenant, and affected the right to remove shelves, counters, a heater, awnings, &c. In that case the counters and shelves were substantially nailed to the walls and became part of the construction of the building and were within the covenant, because they had clearly become part of the realty. In *Blancke* v. *Rogers, ubi supra,* the attachments of the machines were not structural in any sense, nor are the fastenings of the bars and their equipment in this case of that character. When such connections are made solely as a means of staying the chattels in their places and not as incorporative of them into the realty, they are not, in my view, improvements of the demised premises.

I have heretofore considered the *status* as chattels of the articles in dispute, other than the two chandeliers, the brass gas-fixtures and the electric-light globes. These latter articles, I think, differ from the bars and their equipment in their relation to the realty in all the respects noted. They were not within the articles which were obtained to be sold to the mortgagors upon the agreement to give the chattel mortgage. I do not understand that they were unattached when Van Cleef examined the premises and had the chattel mortgage executed. Their attachment to the realty was not casual and for a purpose consistent with their continued use as chattels. They were as solidly and permanently connected with the gas-pipes (which were a part of the realty) as the nature of their use would permit. This part of the realty (the gas-pipes) was not usable without these gas-fixtures, nor could the gas-fixtures be used without the gas-pipes. They became on their attachment so entirely an improvement of the realty that they were within the operation of the covenant, and were, when the chattel mortgage was given, real estate, and as to them the chattel mortgage was inoperative.

I will advise that an injunction be allowed to restrain only the sale of the two chandeliers, the brass gas-fixtures and the electric-light globes.