*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOE VONTAE DANIEL REED,

        Defendant-Appellant.

UNPUBLISHED
March 2, 2023

No. 360959
Wayne Circuit Court
LC No. 18-007617-01-FC

Before: RICK, P.J., and M. J. KELLY and RIORDAN, JJ.

PER CURIAM.

Defendant appeals by leave granted[1] his jury trial convictions of six counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) and (2)(b) (sexual penetration of a victim less than 13 years old by an individual at least 17 years old).[2] On appeal, defendant argues: (1) that his trial counsel performed ineffectively by failing to make a motion for a directed verdict at the close of the prosecution's proofs, and (2) that the trial court erred by denying defendant's request to allow him to amend his witness list after the prosecution rested so that he could call his mother, Malise Reed, whom he asserted was a res gestae witness and should have been included on the prosecution's witness list. We affirm.

## I. BACKGROUND

The victims in this case are defendant's nieces, AH and TP. AH was eight years old at the time of the trial. She testified that she lived with her mother, Erisha Harris, who is defendant's sister, and with her brother and defendant in 2016. AH testified that in 2016 she was coming out of the bathroom when defendant motioned for AH to go into his bedroom. Defendant closed the door behind them. Defendant grabbed AH by the arms and put her on the bed. He pulled down

---

[1] *People v Reed*, unpublished order of the Court of Appeals, entered July 28, 2022 (Docket No. 360959).

[2] The offenses were alleged to have occurred between October 9, 2016, and December 1, 2017.

AH's pants and underwear while she was on "all fours" on the bed. Defendant pulled down his own pants and underwear. Defendant came up behind AH and "put his private part in my butt."[3] Defendant had his hand over AH's mouth as she was crying. AH testified that as this was happening Harris came into the room. Defendant jumped down to the floor, put his "private part" back into his underwear, and pretended to be talking on the phone. According to AH, defendant had done this to her more than five other times on different days. Defendant told AH not to tell anyone or he would kill her.

Harris testified that when she came into defendant's bedroom she saw AH with her pants and underwear pulled down. AH was on her hands and knees on the bed. Harris heard defendant drop to the floor and she saw him tucking his penis back into his pants. AH was crying when Harris came into the room. Harris told defendant to leave without accusing him of anything. Defendant responded that he did not do anything. AH was still crying when she told Harris that defendant tried to anally penetrate her. AH told Harris that defendant had done this to her 10 other times. Harris left the house with AH and returned to the house when the police and ambulance arrived. AH was taken to the hospital.

Michigan State Police forensic scientist Erica Castor received known reference samples from defendant and from AH, as well as swabs obtained from various locations on AH's body, including AH's inner labia majora and labia minora, her outer labia majora area, her anal and perianal area, her breasts, and the inside of her mouth. Castor testified that the DNA recovered from AH's left and right breast swabs indicated the presence of male DNA. The amount of DNA recovered from AH's outer labia majora swabs was insufficient for autosomal DNA analysis, but the swabs did reveal the presence of male DNA. No male DNA was detected on the cuttings Castor took from the inner labia majora, labia minor, anal/perianal, and oral swabs. Castor explained that each cutting "is a simple spot at one point in time. I can tell you from that cutting, from that swab, from that location that there is no male DNA." She agreed that she could not say, to a scientific certainty, that there was never any male touching in those areas. She could not reach a conclusion. Castor selected the left and right breast swabs to be analyzed for DNA analysis.[4] Danielle Hankinson, the forensics scientist who performed the DNA analysis on the samples, testified that defendant was excluded as one of the contributors to the DNA on AH's left and right breasts. She testified that the lack of defendant's DNA on AH's breasts did not necessarily mean that defendant never touched AH's breasts.

AH testified about another specific incident involving defendant. She testified that defendant locked the house door after Harris went outside. Defendant picked AH up and put her on the dresser in the living room. He pulled down AH's pants and underwear to her knees. AH tried to stop defendant by pushing his hands off her pants and telling him to stop, but defendant told her to shut up and threatened to kill her if she told anyone what happened. AH testified that

---

[3] AH described "private part" as the body part from which someone pees. She described "butt" as the body part where "brown stuff comes out" when someone goes to the bathroom.

[4] Castor testified that though she did not find male DNA on the inner labia majora, anal/perianal, or oral swabs, the lack of male DNA did not mean that there was no "male touching" in those areas.

defendant pulled down his pants and underwear and put his private part in her private part. When defendant saw Harris making her way toward the house, he unlocked the door, pulled AH off the dresser, and told AH to go to the bathroom. AH noticed that she was bleeding. AH did not tell Harris about the incident because she felt she had done something wrong.

AH testified about an incident between defendant and her cousin, TP. TP went to the basement to do laundry in Malise's basement. Defendant also went to the basement. AH subsequently went down the basement stairs but did not go to the laundry area where defendant and TP were. AH saw defendant touching TP's nipples, butt, and private area over her clothing. TP told defendant to stop but he did not. The incident ended when TP's mother went into the basement.

TP, who was 13 years old at the time of trial, testified that in 2016 and 2017 she lived with her mother, Shanika Reed, who is defendant's sister; her grandmother, Malise; and with her sister, her aunt, and defendant. TP stayed home from school one day in December 2017 with her grandmother, defendant, and her 3-year-old sister when she was living on Stansbury Street. TP was asleep in her bedroom and her grandmother was asleep in a separate bedroom. TP was awakened by defendant rolling her onto her stomach and pulling down her pants and underwear. TP tried to stop defendant from pulling her pants down by moving his hand and telling him to stop. TP testified that defendant pulled down his own pants and underwear and "put his private part in my butt."[5] Afterward, defendant pulled up his pants and underwear and left the room.

TP testified that defendant did the same thing to her on another occasion. He pulled down her pants and underwear and anally penetrated her. According to TP, defendant "put his private in her butt" more than five times at various locations where she stayed or lived. The incidents occurred first at a house in Eastpointe, next at a house on Tracy Street, and finally at a house on Stansbury Street.[6] TP testified that she revealed the incidents to Reed in 2017. She did not tell Reed sooner because she feared that nobody would believe her. According to TP, after Reed read text messages on TP's phone, Reed asked TP if someone had been "touching" her. TP told Reed that defendant had been touching her. In sum, TP testified that defendant anally penetrated her more than five times.

Reed testified that her mother and defendant "basically moved to every house that I lived in." They "always stayed with her," but defendant was "in and out." In December 2017, Reed looked through TP's phone because TP had been acting "different and strange." After Reed read text messages on TP's phone, Reed talked to TP in the presence of Malise. Reed asked TP why she felt the way she did, TP started to cry and offered to show Reed her journal. The journal

---

[5] TP described defendant's private part as the part used "to pee." She described her butt as the part "where the poop come[s] out."

[6] TP testified that she wrote a journal entry on December 4, 2017, that said, "Today it happened again while . . . my Nana was 'sleep." TP clarified that by "it happened again," she was referring to defendant "touching" her. This entry was describing the event when she was awakened by defendant turning her over and anally penetrating her. In a December 11, 2017 entry, TP wrote that she was celebrating that it had been a week without defendant touching her.

included entries such as "[h]e did it again today", and "[h]e came into my room again today." When Reed saw the entry that said "[t]oday he took my virginity," Reed put the journal down to take TP to the hospital. Malise asked what was going on. Reed told Malise to "[a]sk your son. He took my daughter's virginity[.]" As Reed was leaving the house, she heard Malise speaking on the phone with defendant. When Reed returned home, she asked Malise to read the journal with her and talk about it, but Malise refused. Reed later noticed when she was giving the journal to the police that the page where TP had written that defendant took her virginity had been torn out.

Defendant testified that on the day AH alleged that the bedroom incident occurred he was in his bedroom on the phone when AH tried to enter his room. He pushed AH out of his room and she fell to the floor in the hall and started crying. Defendant explained to Harris what had happened. Defendant subsequently overheard AH tell Harris that defendant had touched her. Defendant ran to the kitchen and told Harris that he did not do anything but push AH. After Harris left, defendant stayed at the house until his cousin came over and told him to leave. Defendant went to Malise's house.

Defendant testified that in the following months he lived with Reed and TP for part of the time. He occasionally saw AH when others were present. Defendant confirmed that he shared a residence with AH and TP during the timeframe that they alleged he assaulted them. Defendant denied ever being alone with either AH or TP during that time. He denied the allegations of AH and TP. On cross-examination, defendant affirmed his testimony that AH did not come into bedroom and that her pants were on when she approached his room. The prosecutor confronted defendant with his statement during a police interview on May 3, 2017. In that statement, defendant said: "She had her pants down. She came from the bathroom. She said her booty hurt and tried to get on my bed. I told her to leave out. She tried to get on the bed. I pushed her on the floor." Defendant denied making the statement. Subsequently, however, Officer Elaine Caldwell authenticated a video of defendant giving the above-quoted statement and initialing it. The video was played for the jury.

Defendant testified that on the day that TP alleged that defendant touched her, he went to his cousin's house around 9:00 a.m. He denied seeing TP that morning.

The jury found defendant guilty of six counts of CSC-I.[7] The jury also found that AH and TP were under 13 years old when the offenses occurred and that defendant was at least 17 years old when the offenses occurred. The court sentenced defendant to concurrent prison sentences of 25 to 50 years for each count.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

"A claim of ineffective assistance of counsel is a mixed question of law and fact." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from

---

[7] Four of the counts pertained to AH. Two of the counts pertained to TP.

an ineffective assistance of counsel claim de novo." *Id*. Clear error exists where the reviewing court is left with a definite and firm conviction that the lower court made a mistake. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). Because a *Ginther*[8] hearing was not conducted, our review is limited to mistakes apparent on the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

"Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise." *Petri*, 279 Mich App at 410. Defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Jurewicz*, 506 Mich 914, 914; 948 NW2d 448 (2020) (citation omitted). "Failure to raise a futile objection or advance a meritless argument does not constitute ineffective assistance of counsel." *People v Zitka*, 335 Mich App 324, 341; 966 NW2d 786 (2021).

Defendant argues that his trial counsel was ineffective by failing to move for a directed verdict at the close of the prosecution's case in light of the testimony that defendant was excluded as a contributor of DNA contained in breast swabs taken from AH. Specifically, he contends that that "the lack of conclusive DNA evidence would have led a zealous attorney to move for a directed verdict."

Had trial counsel moved for a directed verdict, the trial court would have been required to view the evidence presented by the prosecution up to the time the motion was made in a light most favorable to the prosecution, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Riley*, 468 Mich 135, 139-140; 659 NW2d 611 (2003). "A defendant is guilty of CSC-I, MCL 750.520b(1)(a), if he or she engaged in sexual penetration with the victim and the victim was less than 13 years old." *People v Solloway*, 316 Mich App 174, 181; 891 NW2d 255 (2016). "Sexual penetration" is defined as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of another person's body . . . ." MCL 750.520a(r).

The testimony of AH and TP, viewed in the light most favorable to the prosecution, was enough for a rational juror to find beyond a reasonable doubt that defendant sexually penetrated AH four times and that he sexually penetrated TP two times. Our Legislature has deemed that "[t]he testimony of a victim need not be corroborated in prosecutions under sections 520b to 520g," which includes defendant's prosecutions under 520b. MCL 750.520h. *Solloway*, 316 Mich App at 181 (holding that in criminal sexual conduct cases, a victim's testimony may be sufficient to support a defendant's conviction and need not be corroborated); see also *People Bailey*, 310 Mich App 703, 713-714; 873 NW2d 855 (2015) (noting that "it has long been settled that a complainant's testimony regarding a defendant's commission of sexual acts is sufficient to support

---

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

a conviction for CSC-I"). Defense counsel's decision not to advance a meritless argument does not constitute ineffective assistance of counsel.[9] *Jurewicz*, 506 Mich at 914.

### III. RES GESTAE WITNESS AND MOTION TO AMEND WITNESS LIST

Defendant argues that the trial court abused its discretion when it denied his motion to amend his witness list to include Malise and precluded defendant from calling Malise. He contends that Malise was a res gestae witness and, therefore, it was the prosecution's duty to include Malise on the prosecution's witness list.

"A trial court's decision whether to allow a late endorsement of a witness is reviewed for an abuse of discretion." *People v Gadomski*, 232 Mich App 24, 32-33; 592 NW2d 75 (1998). An abuse of discretion occurs when the trial court's decision falls "outside the range of principled outcomes." *People v Dickinson*, 321 Mich App 1, 18; 909 NW2d 24 (2017). We review the trial court's factual findings, including whether a witness is a res gestae witness, for clear error. *People v Lawton*, 196 Mich App 341, 348; 492 NW2d 810 (1992).

The trial court ordered the parties under MCL 6.301(A)(1) to provide a final witness list no later than 28 days before trial. Defendant failed to file a witness list before trial. The court allowed defendant to file his witness list on the first day of trial, January 28, 2019, with the caveat that those witnesses who were on the witness list would be available to provide a statement to the officer in charge the following day. Malise was not named on defendant's witness list. When the officer in charge went to obtain witness statements, Malise told the officer that she wanted to talk to him and so the officer took her statement. After the prosecution rested its case on the fourth day of trial, February 5, 2019, defendant moved to amend his witness list to add Malise. The prosecutor objected because Malise was not included on defendant's witness list.

The court told defendant that he should have moved to add Malise to the witness list the previous morning. At that point, defendant argued that the prosecution had presented testimony that Malise was present during some of the incidents and that Malise was a res gestae witness. He maintained that the prosecutor had a duty to call res gestae witnesses.

A res gestae witness is one who witnesses some event in the continuum of a criminal transaction and whose testimony will aid in developing a full disclosure of the facts at trial. *People v Long*, 246 Mich App 582, 585; 633 NW2d 843 (2001). The prosecutor is obligated to disclose all known res gestae witnesses, to update that list, and to provide the names of all witnesses who the prosecution intends to call at trial. *Id*. at 517-521; MCL 767.40a(1)-(3). "[T]o warrant reversal for a violation of MCL 767.40a, defendant must show that he was prejudiced by noncompliance with the statute." *People v Everett*, 318 Mich App 511, 523; 899 NW2d 94 (2017) (quotation

---

[9] The factual premise of defendant's argument is faulty. The charges in this case alleged sexual penetration, not sexual contact. AH did not testify that defendant touched her breasts. Therefore, there was no significance to the evidence that the male DNA found on AH's breast swabs did not belong to defendant. Further, male DNA was found on AH's outer labia majora. Defendant was not specifically excluded as a contributor of the DNA. Rather, the amount of DNA on the swabs was simply insufficient to allow further DNA analysis.

omitted). The prosecution does not have a duty to produce a res gestae witness. *People v Perez*, 469 Mich 415, 418-419; 670 NW2d 655 (2003). Rather, the prosecution is only required to notify defendant of any known res gestae witnesses and help obtain witnesses upon request by the defense. *Id*.

Malise was not disclosed by the prosecution or endorsed on the prosecution's witness list, but there is no indication that she was a witness to any of the events that formed the basis for the charges against defendant. The trial court correctly found that Malise was not a res gestae witness as there was no testimony that Malise was present during any of the alleged incidents. And, significantly, defendant clearly knew about Malise. Consequently, defendant cannot have suffered any prejudice.

The trial court also did not abuse its discretion when it denied defendant's request to allow the late endorsement of Malise and precluded defendant from calling Malise to testify. Defendant asserted, apparently with respect to the alleged incident between defendant and TP when Malise was sleeping in another room, that Malise "should have an opportunity to testify to whether she was asleep or not asleep." In essence, defense counsel suggested that Malise's testimony might have impeached TP's testimony with respect to one alleged incident. Defendant offered Malise's statement as an offer of proof, but did not describe on the record what Malise's testimony would have been. After review of Malise's statement, the trial court stated that "there was no testimony about a November 2017 incident before Thanksgiving."[10] On the basis of this finding, the court found that Malise's testimony would not constitute "rebuttal or impeachment to what was testified to here." On the basis of this finding, the trial court denied defendant's request to call Malise. On this record, defendant has failed to show that the trial court's denial of his request to endorse Malise after the prosecution rested its case and to allow her to testify was outside the range of principled outcomes.[11] *Dickinson*, 321 Mich App at 18.

Affirmed.

/s/ Michelle M. Rick
/s/ Michael J. Kelly
/s/ Michael J. Riordan

---

[10] There was no testimony at trial specific to an incident occurring at Thanksgiving 2017.

[11] Furthermore, under MCL 769.26, "[n]o judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless . . . it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." An evidentiary error does not merit reversal in a criminal case unless it appears that it is "more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). Defendant has failed to offer any support for the proposition that not allowing Malise to testify was outcome-determinative.