## SEACOAST REAL ESTATE COMPANY

*v.*

## AMERICAN TIMBER COMPANY et al.

[Submitted June 5th, 1918.   Decided July 10th, 1918.]

1. In a suit to foreclose a mortgage the complainant has the burden of showing how it credited or disposed of the proceeds of sale of any collateral covered by the mortgage.

2. The defendant, who was the owner of lots subject to a certain mortgage, having conveyed eight of them as collateral security to complainant mortgagee, who then bought the mortgage, is entitled to credit for the entire proceeds of complainant's sale of the eight lots, without deducting the amount due on the mortgage on them, unless complainant surrenders such mortgage.

3. The law of the state where notes are made and payable governs as to usury.

4. The defence of usury may be pleaded by a surety.

5. The defendant is not estopped from pleading usury on notes because in a prior proceeding against it, which has not been tried, it was not pleaded. The question may still be raised in that suit by amendment of the pleadings.

6. The act of 1902 (*P. L. 1902 p. 459*) does not relate to the ordinary debts of a corporation.

7. A mortgagee in possession has authority and is under the duty to keep the mortgaged premises in repair, and is entitled to be repaid any disbursements made for the protection or preservation of the property; but where he knowingly makes permanent improvements, without the consent or fault of the owner, he cannot, as complainant in equity, obtain reimbursement for such expenses even to the value of the benefit conferred upon the landowner.

8. If, under expert advice, and in the belief that such repairs were necessary for protection of the property, he makes such repairs which under some other method might have been made for a smaller expenditure, he is entitled to reimbursement.

---

On bill, &c.

*Messrs. Durand, Ivins & Carton* and *Mr. John D. McMullin* (of the Philadelphia bar), for the complainant.

*Mr. Martin V. Bergen, Jr.,* and *Mr. DeWitt Robinson* (of the Philadelphia bar), for the defendants.

FOSTER, V. C.

Complainant's bill is filed to foreclose as a mortgage a conveyance made by the defendant American Timber Company to Lydia S. Hinchman, under date of May 31st, 1912. On June 22d, 1914, Lydia S. Hinchman and Charles S. Hinchman, her husband, assigned this conveyance, or mortgage, and the indebtedness secured thereby, to complainant. These deeds were given to secure the payment of the indebtedness owing by one Henry H. Yard to both Mr. and Mrs. Hinchman.

The premises in question consist of two tracts of land at Manasquan Beach, in Monmouth county, with an ocean frontage of about three thousand feet, and the lands extend southerly along the beach from a point about five hundred feet north of the Brielle road to the Manasquan river.

At the time the deed from the American Timber Company to Mrs. Hinchman was made and delivered, Henry H. Yard and wife gave to Mrs. Hinchman a quit-claim deed dated June 1st, 1912, for their interest in the premises.

The defendants are the American Timber Company, of which Henry H. Yard, now deceased, was president, and his widow and minor son. The complainant, of which Mr. Hinchman, now deceased, was president, is practically another name for Charles S. Hinchman and the members of his family, and the defendant corporation is only another name for Mr. Yard and members of his family.

The indebtedness which these deeds were intended to secure, complainant claims now amounts to $37,818.90, and arises out of the following transactions:

In 1901 Mr. Yard borrowed from Joseph M. Gazzam and A. O. Granger certain sums of money and gave to each of them his notes for $3,000. On October 1st, 1904, the indebtedness being unpaid, Yard gave to Gazzam and Granger his notes for $3,500, each payable in one year with interest. After maturity these two notes were purchased by Mrs. Hinchman and later were assigned by her to complainant. The security which Gazzam and Granger held for their notes was the first tract of land in question, which the American Timber Company had conveyed to Gazzam and Granger and which they in turn conveyed to Mrs. Hinchman when they sold her the notes, and which she transferred, with other security, to complainant when she assigned the notes.

The indebtedness of Mr. Yard to Mr. Hinchman is entirely distinct from the indebtedness due on the notes bought by his wife, and is based upon a note dated October 31st, 1904, payable to Hinchman's order for $22,452.12. This note was given as a result of a settlement between Yard and Hinchman at this date; and attached to this note is a statement, dated October 19th, 1904, showing the collateral held by Hinchman for its payment.

Since the delivery of the deeds, in 1912, Mr. and Mrs. Hinchman and complainant have been in actual possession of the premises and have rented portions thereof, and Mr. Hinchman has had the entire control and management of the property and

has collected a gross annual income therefrom of about $5,000, and complainant now values the property as being worth about $75,000.

The parties recognize that the Hinchmans and the complainant have since 1912 been occupying the position of mortgagees in possession, but defendants dispute the amount claimed to be due complainant on the following grounds:

1. That complainant has not given proper credit for the amount realized from the sale of some of the collateral shown on the above-mentioned statement.

2. That the amount claimed to be due on the notes to Gazzam and Granger is usurious.

3. That the amount charged for repairs to the mortgaged premises is improper and illegal.

Considering these objections in the order stated, it appears that the first objection is based upon the following circumstances:

In the statement of collateral prepared by Mr. Yard and Mr. Hinchman, under date of October 19th, 1904, appears, among other property, the following:

Belmar lots 2952–59, $3,000.00.

In the account attached to the replication complainant makes this statement:

```
12/31/08 proceeds, 2952/7, Belmar............  $2,297 51
Less Brown mtg. & int. for 9/15/04..........   1,402 30
                                               ─────────
                                                $895 21
```

The Brown mortgage referred to was a mortgage given by Harry Tatu and wife to Peter and Anthony Brown on October 15th, 1900, covering about ten acres of land at Belmar, and not part of the lands involved in this action. Subsequently, Tatu and wife conveyed this property to the American Timber Company, subject to this mortgage, and on January 27th, 1902, the American Timber Company, as part of the collateral for Yard's indebtedness, conveyed to Charles S. Hinchman, out of this tract, eight lots, Nos. 2952–2959, both inclusive, subject to the Brown mortgage.

CASES IN CHANCERY, 1918.                    297

*89 N. J. Eq.*    Seacoast Real Est. Co. *v.* Amer. Timber Co.

On September 14th, 1904, the Browns assigned this mortgage to C. Russell Hinchman, the son of Charles S. Hinchman, for the consideration of $1,115. On September 9th, 1904, Charles S. Hinchman sold lots Nos. 2958 and 2959 for $1,200, and on December 5th, 1908, he sold the remaining lots, Nos. 2952 and 2957, for $2,500. Releases of the Brown mortgage were given by C. Russell Hinchman for all these lots for the nominal consideration of one dollar in each case.

The total amount received from the sale of the eight lots by Mr. Hinchman was $3,700, from which he paid taxes, commission and a recording fee amounting to $232.49, leaving a net balance in Hinchman's hands of $3,467.51, and of this sum complainant gives defendants a credit of only $895.21.

Complainant seeks to justify its position by claiming that lots Nos. 2958 and 2959 had evidently been included in the statement of collateral through mistake; that the sale had been made and credit therefor given to Mr. Yard's account six months before the settlement was reached between Yard and Hinchman. Complainant contends there is no proof to show that the proceeds of this sale were not properly credited as it claims, but the answer is that there is no proof to show that it was, and the burden is upon complainant to show how it credited or disposed of the proceeds of the sale of any of the collateral held by Mr. Hinchman or itself as security for Yard's debt. The deed for these two lots was executed and acknowledged by Mr. Hinchman on September 19th, 1904, just one month before the date of the collateral statement; and I am unable to find anything in the record to support the claim that the proceeds of the sale had been previously credited on Yard's indebtedness, or that the collateral statement erroneously included these two lots; and my conclusion is that defendants should be credited with $1,170, the net amount realized by Mr. Hinchman from the sale of these lots, with interest.

Complainant further insists it is entitled to charge against the proceeds of the sale of the remaining six lots, Nos. 2952–2957, the amount due on the Brown mortgage.

It appears that C. Russell Hinchman actually bought and held the Brown mortgage for his father. It further appears that for

298 CASES IN CHANCERY, 1918.

Seacoast Real Est. Co. v. Amer. Timber Co. 89 N. J. Eq.

reasons satisfactory to Mr. Hinchman, the son released the lien of this mortgage from the collateral lots as they were sold for a merely nominal consideration of one dollar. Complainant claims Mr. Hinchman was obliged to purchase the Brown mortgage to protect his collateral, and prevent its foreclosure, and it is clear that he did not buy it for the Yard account, but apparently held it as an investment and did not charge it against nor connect it with the Yard account until 1912—eight years after he bought it and four years after the last of the eight lots were sold. At the time of the sale of the lots, Hinchman credited the entire proceeds thereof in his books and did not charge the principal and interest of the mortgage to defendants until December, 1912. It would seem that Mr. Hinchman in releasing the lots for a nominal consideration thought he had ample security in the balance of the Tatu property, for the amount due on the Brown mortgage; and in this he was probably correct. Whether he was or not, defendants are entitled to have either the entire net proceeds of the sale of these eight lots credited on the amount now claimed to be due, or they are entitled to have the Brown mortgage surrendered to them for cancellation. If complainant desires to hold the Brown mortgage as an investment, which it is entitled to do, because the transaction is entirely independent of the matters involved in this controversy, then defendants are entitled to be credited, on the amount now claimed to be due, with the net proceeds of the sale of the Belmar lots amounting to $3,467.51, instead of the credit of $895.21.

The defendants' next objection, that the Gazzam and Granger notes are usurious, is based on the claim that between October 9th, 1901, and December 11th, 1901, Mr. Yard had borrowed sums of money from both Gazzam and Granger; that the amounts he actually borrowed from each of them was $2,400, and that as evidence of his indebtedness he gave each of them four notes for sums aggregating $3,000. Apparently, Yard did not pay either the principal or interest of the notes when due, and on October 1st, 1904, he gave Gazzam and Granger the notes in question for $3,500 each, payable in one year; the balance of the interest due on the old notes of $21.26 was paid by Yard to Gazzam and Granger.

It appears from the testimony of Wm. S. Wallace, a member of the Philadelphia bar, and who for years acted as the attorney of Mr. Gazzam, that he is personally familiar with these transactions, and he states that Gazzam and Granger agreed to loan Yard $4,800; that each of them loaned him $2,400, and that Yard gave each of them his notes for $3,000, the difference between the amounts of the loans and the amount of the notes representing the bonus Yard had agreed to pay them for the accommodation; that in 1904, when Yard was pressed for payment, he agreed to give Gazzam and Granger each his note for $3,-521.26, representing the principal of, and the interest due on, the old notes. Later he gave his note, dated October 1st, 1904, to each of them for $3,500, and paid $21.26 to each of them in cash. Wallace is corroborated by a copy of his letter to Gazzam's nephew, in which he explains the transactions between Yard and Gazzam and Granger in connection with negotiations then pending for the sale of these notes to Mrs. Hinchman. He is further corroborated by the entries on the stubs in Mr. Gazzam's check book, and the proof is convincing that the amount actually owing by Yard to both Gazzam and Granger, including interest, on October 1st, 1904, the date of the notes in suit, and which were purchased in the name of Mrs. Hinchman after maturity, was $5,592.28, and not $7,000, as complainant claims.

The pleadings and proofs show that notes were made and were payable in Pennsylvania under the Pennsylvania act on usury and negotiable instruments. *P. L. (Pa.) 1901 p. 208* §§ *52, 58.* Only the amount actually loaned on them, with legal interest, can be recovered, and the law of Pennsylvania governs such a situation. *Trust Company* v. *Electric Company, 57 N. J. Eq. 42.*

Complainant contends, however, that if the notes are usurious this defence has been waived, and that defendants are estopped from setting up such defence in this action. This contention is based on the fact that in other proceedings instituted by Mrs. Hinchman, in 1911 (and not yet tried), to collect the amount due on these notes, Yard and the American Timber Company appeared and filed pleadings therein, but they did not, in any of these actions, set up the defence of usury against the amount

300          CASES IN CHANCERY, 1918.

Seacoast Real Est. Co. *v.* Amer. Timber Co.     *89 N. J. Eq.*

claimed to be due; and in consequence, by their failure so to do, it is claimed that the defendants herein are estopped from doing so. And it is further claimed that it is doubtful if the American Timber Company as a surety can, under *P. L. 1902 p. 459; Comp. Stat. p. 5706*, which forbids a corporation to set up usury as a defence to an obligation, set up the defence of usury now. All the defendants have pleaded usury in this case—the American Timber Company pleading it especially as surety—which it may do (*39 Cyc. 1074*), and, if necessary, the pleadings filed in the other actions could, on proper application, be amended to permit the defendants therein to set up such defence. *Hill v. Colie, 25 N. J. Eq. 469; Corning v. Ludlum, 28 N. J. Eq. 398*. The right of the timber company to raise the defence is not affected by the act of 1902, as this statute has been held to be limited in its application, not to the ordinary debts of a corporation, but to obligations of a corporation which have been bought in the open market and have gone before the public for investment. *Lembeck v. Storage Company, 70 N. J. Eq. 757* (at *p. 761*); *Mazarin v. Building Company, 80 N. J. Law 35*. As the proofs show that neither Mrs. Hinchman nor complainant paid the face value of the notes, and as they also show that the transactions with respect to them, between Yard and Gazzam and Granger, were usurious, all that complainant can be permitted to recover thereon is the amount actually loaned on the notes, with lawful interest.

The last objection to complainant's claim questions the necessity for and the legality of the charges made by complainant for repairs to the mortgaged premises.

Defendants claim the repairs were unnecessary; were extravagantly made and were actually improvements, and not repairs; and that they were made for the present and future permanent improvement and development of the property, with the intent on the part of Mr. Hinchman to improve defendants out of their property by making the amount they would be required to pay, in order to redeem, so large that defendants would be unable to pay it.

About one-half of complainant's total claim, or $18,986.16, represents the cost of the repairs which complainant claims it

was necessary to have made, in order to protect and preserve the mortgaged premises, and that these repairs were absolutely necessary because of the following circumstances:

About 1882 the federal government completed the construction of a stone crib at the southeasterly end of the mortgaged premises; this crib extended from the line of the beach into the ocean for a distance of about one hundred feet and extended inland for about two hundred feet; in connection therewith the government also constructed a dike extending inland from the westerly end of the crib for a distance of about one thousand eight hundred feet to Stump Point, the highest and nearest point of firm land on what is called the Island of Sedges. The government's purpose in building the crib and dike was to establish a permanent channel for the Manasquan river. Prior to the construction of the crib and dike the river had no fixed outlet to the ocean; the action of the elements caused the outlet to shift from time to time towards the north; the sand would be washed and blown away; at times the erosion on the beach would be very pronounced; sometimes the greater part of the beach was washed away by the shifting of the inlet as much as half a mile north of its present location. Before the government improvement was made there was no building of any kind on the beach.

As a result of the construction of the crib and dike, the inlet was retained in its present location; the beach became wider and ten or more feet higher; the creeks or bodies of water back of the beach became smaller and the marsh land firmer; all erosion ceased; a street was built nearly the entire length of the beach; water mains were laid therein by the municipality; about two hundred bungalows have now been built on the beach, producing an annual rental of about $5,000. And complainant claims that under Mr. Hinchman's management the rental value of the lands has increased from $10 per lot, in 1911, to $50 a lot now; and that the value of the property has increased from $25,000, in 1912, to $75,000 now.

Under the deed from defendant timber company to Mrs. Hinchman, she entered into possession of the property in 1912, and from that time to the present the property has been under the sole charge of Mr. Hinchman and complainant. For some

time prior to 1912 the dike, which was then about thirty years old, has been getting out of repair; about half of the plank sheathing had broken or rotted away, and some of the piling was gone and some of the stringers were rotten. Some of the stone rip-rap that lay in front of the piling had been allowed to drop down by the water scouring the sand from under it. The government had not, and apparently would not, make any repairs; the crib at the mouth of the inlet adjoining the beach was, and is, in fairly good condition. As a result of the changed condition of the dike the waters of the river got behind it and formed large sized pools or lagoons at times—some of them more than seventy-five feet in width, and washed or scoured some sand away from part of the beach adjoining the crib. Mr. Hinchman did nothing to remedy this condition until the summer of 1914, and then he called on one Howland, a practical bulkhead builder, and after they had inspected the situation and talked the matter over, and without consulting defendants, he gave Howland an order to repair the dike at a cost of about $11,970, without any plans, specifications or written contract. Mr. Hinchman told Howland's son, who actually did the work, that the purpose in repairing the dike was to fill in behind the dike with sand level with the plank on the dike. In 1913, Hinchman told the witness Haberle that he intended to fill in on the northwest side of the dike and put a boulevard there parallel with the dike, and while Howland was at work on the dike, Mr. Hinchman told the witness Mount that he was going to improve the river front and put a boulevard in there and lay out some lots and gave Mount an option to purchase one of the lots. Within a few months after Howland had finished his work, the severe storms of the winter practically demolished all of it and left the dike in almost the same condition it was in during the early part of 1914.

In 1915, Hinchman had the dike repaired again and employed Mr. Rogers, an engineer, to advise about the work. Rogers examined the dike in the fall of 1915 and found that in the central portion of it, for a distance of probably one hundred and fifty feet in length, the piling and sheathing had been taken out by the action of the tides, and a contract was given on his specifications to the Logan Construction Company for $6,682,

CASES IN CHANCERY, 1918. 303

*89 N. J. Eq.*    Seacoast Real Est. Co. *v.* Amer. Timber Co.

to rebuild, repair and reinforce about one thousand feet of the dike; and an additional contract was also made for $490 for repairs to the crib. In connection with their talk about repairing the dike, Hinchman gave Rogers the idea that he contemplated filling in the swamp or meadow land out to the dike, and Rogers, at Hinchman's request, prepared maps in January, 1915, showing the meadow lands north of the dike and west of the beach strip laid out in streets and lots, and from what Hinchman told him, Rogers understood that there was a general scheme to deepen the creek and fill in north of the dike by pumping sand from the bars in the river on the northerly side of the dike.

The repairs made to the dike in 1915 are still very largely intact, although some part of the piling has been drawn out of place and is leaning out towards the river, and the scouring of sand and the formation of the pools back of the dike have almost entirely ceased.

Practically all the parties agree that the crib and dike have kept the inlet in a permanent location; most of them agree that it is probably necessary that the crib and the dike, or some substitute for the dike, should be maintained in order to prevent the tide of the river from reaching the beach and from washing away the sand that has formed back of the crib or dike, but they greatly differ as to the methods to be adopted and the expenditures that would be required for such purposes.

Complainant and its witnesses, with the exception of Mr. Oram, who was the engineer of, and superintended the repairs made by, the Logan Construction Company in 1915, all claim that the repairs were necessary and that their cost was reasonable. Mr. Oram states that the work necessary to preserve the property could have been done for about $3,000 by building a spur dam, but he did not inform Mr. Hinchman or Mr. Rogers of this, because there was more profit in it for his company to do the work as Hinchman and Rogers outlined it, and because the spur dam would not answer the purpose Mr. Hinchman told him he had in mind in doing the work, which was to pump in sand from behind the present bulkhead and fill it up; and the work his company did was not to preserve the property, but to fill in with sand and carry out a further development scheme. The engineers of

304          CASES IN CHANCERY, 1918.

Seacoast Real Est. Co. *v.* Amer. Timber Co.          *89 N. J. Eq.*

defendants claim that scarcely any repairs were required to be made to the dike for the purpose of protecting the property; they agree with Oram that if protection and not development had been the object in doing the work, then the total cost of the same would not exceed two or three thousand dollars.

It further appears that whatever scheme of improvement or development was contemplated, nothing further had been done to carry it out.

It is admitted that at the time these expenditures were made in 1914 and 1915, Mr. Hinchman knew that he was simply a mortgagee in possession, and that he did not make the repairs or improvements under the mistaken belief that he was the absolute owner in fee.

The law applicable to the present situation is well settled and the principle adopted by our courts is, that a mortgagee in possession has the authority and is under the duty to keep the premises in necessary repair, and is entitled to be repaid any disbursements made for the protection or preservation of the property. In *Clark & Smith* v. *Smith et. al., 1 N. J. Eq. 121* (at *p. 139*), Chancellor Vroom remarked that "the language of the books is 'necessary repairs,' and this language has been construed strictly." In *Vanderhaise* v. *Hughes, 13 N. J. Eq. 410,* Chancellor Green held that credit should be given the grantee for both necessary repairs and lasting improvements, but this extension of the principle was made, as Mr. Justice Dixon points out in delivering the opinion of the court of errors and appeals in *Freichnecht* v. *Meyer, 39 N. J. Eq. 551* (at *p. 562*), on the inference that all parties considered the grantee to be the absolute owner, and that as such he had made the lasting improvement. And in this latter case, where complainant sought the redemption of the mortgaged premises, it was held that when the grantee under the mistaken belief that he was the absolute owner of the property, made permanent improvements thereto, complainant in order to redeem must pay the mortgagee the value of the improvements, applying the maxim that one who seeks equity must do equity. All the authorities that have come to my notice in cases where the mortgagee is the complainant, limit his right to reimbursement to the money expended for necessary repairs made for the protection or preservation of the property.

Where allowance has been granted to a mortgagee as complainant for permanent improvements, it has been based on the fact that such improvements had been made under a mistaken belief of absolute ownership on the part of the mortgagee; or it has been allowed in cases where the mortgagor as complainant sought to redeem and attempt to appropriate the benefit of the mortgagee's expenditures without compensation.

The principle that must control the present situation is stated in the opinion of the court of errors and appeals in *Laible* v. *Ferry, 32 N. J. Eq. 791* (at *p. 801*), where it is held that—

"It is perfectly well settled that where one knowingly makes permanent improvements upon the lands of another, without the consent or fault of the latter, he cannot, as a complainant in equity, obtain reimbursement for such expenses, even to the value of the benefit conferred upon the landowner."

The facts in this case bring it within the range of this principle. Complainant when he made his expenditures in 1914 knew that he was not the owner of the premises, but only the mortgagee in possession. Assuming some repairs to the dike were necessary, the danger at the time, of injury to the property and mortgage security was neither imminent nor impending. The expenditures were made without notice to the owners and without their knowledge, and these expenditures were made not merely for repairs but as a part of a scheme to improve and develop the property.

At the time the expenditures were made in 1914, there was not much more than $15,000 due on the mortgage, which was past due and which could have been foreclosed with little delay at any time. The Hinchmans had possession of the property from 1912 but made no repairs thereon until 1914. If the dike was out of repair in 1912, as they claim, then they neglected it for nearly two years. At the time these expenditures were made the property is estimated to have been worth at least $50,000— over three times the amount due on the mortgage; the net annual income from the property was then about $4,000, and Mrs. Hinchman and complainant were in position to apply it at any time to the reduction of the amount due on the mortgage, and such reduction would have resulted in paying off the greater part

of the mortgage debt by the time the expenditures now claimed were made.

The expenditure of over $11,000, in 1914, was wasted, because the work it paid for was either badly designed or improperly executed, or both, as most of it did not last a year; and neither the property nor any of the defendants were in any way benefited thereby. The expenditure of nearly $7,000 on the dike in 1915 may be said to have been of some value to protecting a part of the property, and the work done then, or the greater part of it, is still in a fair condition and is a benefit to the property.

This work of 1915 was done under expert advice and was fairly thought to be necessary, and I believe these or some other repairs were necessary at that time. It is true that the proofs show that some other method of repair could have been adopted, the probable cost of which would not have exceeded $2,000 or $3,000. This proof, however, is largely a matter of speculation and estimate on the part of defendants' engineers. The other methods of repair suggested by them might or might not have proven as effective as the one Mr. Hinchman's engineer advised him to adopt, and these other methods of repair might have been built for the estimated amounts, and they might have cost much more. The whole subject is largely based on speculation and estimate of the most general character and is too uncertain to justify me in holding that the cost of the necessary repairs made in 1915 was excessive.

On all the facts I find that Mr. Hinchman was not justified in making the expenditures for repairs and improvements to the dike which he did in 1914; that he was justified in making the expenditures he did in 1915, in making repairs that were necessary to both the dike and the crib, and while these expenditures for 1915 are considerably in excess of defendants' estimate of the cost of such repairs, still I am satisfied they were honestly made in the belief that they were necessary to protect the property and were made under expert advice and for the repair work only which Mr. Hinchman's engineer had designed as necessary for the proper repair of the crib and dike in order to protect the property.

A decree will be advised in accordance with the views herein expressed.