162 N.J. Super. 216 (1978)
392 A.2d 635
NEW YORK AND SUBURBAN FEDERAL SAVINGS AND LOAN ASSOCIATION, A SAVINGS AND LOAN ASSOCIATION DULY ORGANIZED AND EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA, PLAINTIFF,
v.
RICHARD SANDERMAN AND C. REVA SANDERMAN, HIS WIFE; LOUIS CESARANO AND ANNA CESARANO, HIS WIFE: PHILIP TATZ; BERNARD BERGMAN: CHARLES BICK: FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR FRANKLIN NATIONAL BANK; STATE OF NEW JERSEY, DIVISION OF TAXATION, DEPARTMENT OF TREASURY; STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 15, 1978.
*218 Mr. Edward Gross for plaintiff (Messrs. Gross & Novak, attorneys).
Mr. Ernest Allen Cohen for defendant Federal Deposit Insurance Corporation as liquidator of Franklin National Bank.
DWYER, J.S.C.
New York and Suburban Federal Savings and Loan Association (Association) commenced an action to foreclose a first mortgage it held against the lands and buildings which were formerly the Convalescent Hospital of the City of Newark.
In 1959 Newark declared the property surplus and sold it to Philip Tatz. Without my detailing the history of the title, Association has had a first mortgage on the subject premises since 1962. In the intervening years title was placed in various corporations and then conveyed to partnerships which included Philip Tatz and Bernard Bergman. By means of various documents the original mortgage was modified, extended and consolidated with other mortgages.
On September 22, 1975 a partnership consisting of Philip Tatz, Bernard Bergman et al., conveyed the subject premises to Richard Sanderman and Louis Cesarano for $901,479.10. The deed recited that it was subject to a $301,479.10 mortgage in favor of Association and that a $600,000 purchase money second mortgage in favor of the grantors was the balance of the consideration. On that same date the grantors executed the last of the documents with Association which established the amount of its first mortgage as $301,479.10.
Thereafter, Bernard Bergman assigned his interest in the second mortgage to the Franklin National Bank as part of the collateral for a loan. In connection with the liquidation of that bank the Federal Deposit Insurance Corporation (FDIC) succeeded to the bank's interest in the second mortgage. It initially contested the validity of the first mortgage and a number of items for which Association claimed a right to be reimbursed for preserving the property *219 as a mortgagee in possession. After a hearing all issues but one were resolved  that is, Association's claim to be reimbursed the sum of $45,360 for the cost of maintaining a guard on the premises 24 hours a day at a cost of $120 a day from February 5, 1977 to February 17, 1978.
This amount crystalized at the hearing. Supplemental affidavits were submitted by Association concerning the circumstances under which the expense was incurred and the need for it. Supplemental briefs were submitted on the question of law. Counsel for both parties waived further testimony and argument and requested that the court decide the matter.
In connection with the foreclosure of mortgages on real property in certain of the central cities, there have been requests for reimbursement of expenses, such as boarding up the windows and doors to protect the property against vandalism between the date of entry of the judgment of foreclosure and the time of sale. See Cunningham and Tischler, 30 N.J. Practice (Law of Mortgages), 30 § 195 (particularly at 48 for other problems related to vandalism and a mortgagee in possession).
FDIC urges that the expense was unnecessary because the license to operate the nursing home had been revoked, the structures could not be economically used, and to salvage the land value the structures will have to be torn down; hence there was no need for guard service. Its counsel points out that the officers of the Association who testified at the hearing admitted that when the Association received an appraisal report from an outside appraiser pointing these facts out, the Association immediately suspended the guard service. To allow this sum as part of the amount to be raised will shift the cost to the junior lienholders in this case and in others to a mortgagor seeking to redeem; therefore, the FDIC urges that the sum be disallowed.
Association urges that under the decisions in Zanzonico v. Zanzonico, 2 N.J. 309 (1949), cert. den. 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532 (1949); Newark v. Sue Corp., *220 124 N.J. Super. 5, 7-8 (App. Div. 1973), a mortgagee in possession has a duty to protect against vandalism or be held liable for loss or destruction of the property. It points to the following statement in Zanzonico:
A mortgagee who goes into possession of the mortgaged lands assumes a grave responsibility for the management and preservation of the property. It is notorious that in Newark untenanted property is apt to be wrecked by vandals. When the tenants in the six-family house vacated the premises on the order of the public authorities [Tenement House Commission  ed.], complainant could have surrendered the house to Antonio's devisee Michael, or he could have made the necessary repairs and alterations and charged the cost against future rents. But he did neither; he allowed the house to remain empty and took inadequate means to protect it. He is liable for the resulting damage. * * * [at 316]
A mortgagee who goes into possession is under a duty to maintain and preserve the property. The standard by which the discharge of that duty should be judged is that of a provident owner. Essex Cleaning Contractors, Inc. v. Amato, 127 N.J. Super. 364, 366 (App. Div. 1974), certif. den. 65 N.J. 575 (1974); Cunningham and Tischler, op. cit., § 195 at 40. However, until the mortgagee has foreclosed, he is not the owner and must act with due regard to the interests of the junior encumbrancers and the holder of the equity of redemption. Shaeffer v. Chambers, 6 N.J. Eq. 548 (Ch. 1847); cf. Taylor v. Morris, 1 N.J. Super. 410 (Ch. Div. 1948).
It is suggested in 4 American Law of Property, § 16.100 at 190, that there is a limit on the duty of the mortgagee in possession:
He must, therefore, conserve its value by making repairs, and this duty is recognized on the one hand by charging him for any loss that flows from his failure to act and, on the other hand, by allowing him credit for expenditures in carrying it out. There are, however, limitations on this. One is that he is not bound to dig into his own pocket and so need not expend more than the rents and profits he receives. Another is that he does not have to make good or prevent the depreciation caused by ordinary wear and tear  *221 "the silent effect of waste and decay from time." Indeed, in casting upon him this duty of affirmative conduct the standard for its invocation is "willful default," "gross negligence," or "recklessness and improvidence," a rather low standard of responsibility whose [sic] mildness is explained by the fact that the mortgagor, the owner, also should look after the upkeep of his own property. * * *
Whether this suggestion is a correct statement of the law of New Jersey in all circumstances is not necessary to decide.[1] However, the suggestion that the extent of the duty of the mortgagee in possession is influenced by the amount of rents received or receivable does accord with the holding in Zanzonico, supra.
Judge Bigelow, who wrote the language quoted by the Supreme Court in Zanzonico, supra, in essence gave the mortgagee an option either to take possession, expending funds and collecting the expenditures from future rents, or not take possession but proceed quickly to foreclosure and sale of the real property. Under the first alternative the mortgagee, like a provident owner, would have to weigh the probability of collecting rents against the cost of repairs, taxes, insurance and the mortgagor redeeming the property. Under the second the mortgagee could proceed to foreclosure quickly and rely upon the right to collect any deficiency from the mortgagor. In no circumstance was the mortgagee to take possession and then allow the real property to be dissipated before foreclosure. In other words, the mortgagee was under a duty to evaluate what to do in the same manner as a provident owner would do. But as the Chancery Court pointed out in Seacoast Real Estate Co. v. American Timber Co., 89 N.J. Eq. 293 (1918), rev'd on other grounds 92 N.J. Eq. 219 (E. & A. 1920), it would not allow as part of the amount due on a mortgage on tidal lands sums expended to improve *222 a dike so that the acreage would be increased, but only expenses for repairing an existing dike:
Complainant when he made his expenditures in 1941 knew that he was not the owner of the premises, but only the mortgagee in possession. Assuming some repairs to the dike were necessary, the danger at the time, of injury to the property and mortgage security was neither imminent or impending. The expenditures were made without notice to the owners and without their knowledge, and these expenditures were made not merely for repairs but as a part of a scheme to improve and develop the property. [at 305]
Based on the record before the court, the court finds that there was a default under the first mortgage at least in January 1977. Association was aware that the patients at the nursing home had to be moved out and they were.
There is no evidence that Association had a copy of the list of physical deficiencies in the structure for use as a nursing home released by the Department of Health on September 23, 1975. However, Association is chargeable with knowledge that a nursing home in New Jersey is required to be licensed and that the physical plant must meet certain standards, N.J.S.A. 30:11-1 et seq. There is no dispute that the State had revoked the license to use the premises as a nursing home before January 1977.
In an affidavit submitted to the court the officer of Association in charge of real estate stated he visited the property on February 4, 1977 to inspect the premises. He talked to Richard Sanderman, who was one of the record owners. He further stated:
8. On my visit on February 4, 1977 and in reaching my recommendation [for guard service  ed.] * * * I considered the physical structure, the neighborhood, the fact that the title owner to the property had paid 1.2 million dollars for the land and improvements in 1975, but I did not consider what would be the best use for the property or the value of the property in relationship to comparable sales in the community, etc.
He also stated that he learned during his inspection trip that the nearby Ivy Hill Nursing Home had been almost completely *223 vandalized after it was closed and left unguarded. He reported to Association about the apartments and other structures in the neighborhood of the premises and recommended the employment of 24-hour guard service to prevent vandalism.
From what appears in the record, the Association made its decision to employ 24-hour guard service solely on this recommendation. According to the background of the officer set forth in the affidavit, he had worked for a construction firm in a responsible position. He had been employed by Association for five years.
The structure in question was built in the 1920s. The main portion is 141' x 44' with a full basement and two wings measuring 105' x 26'. It has a slate hip roof of wood construction. Each wing has a hallway which starts at the center and runs the length of each wing and off of which are the rooms formerly used for patients. There are no private bathroom facilities. There is little closet space. Without stating further detail, the court concurs with the finding of all appraisers that the building was at least outmoded. The area in which the property is located is zoned residential.
FDIC employed its appraiser before June 1, 1977, the date of his rather extensive report. FDIC made a copy of it available to Association at least by October 1977. There is a suggestion that a copy was made available earlier, but there is insufficient evidence to so find. Association received a letter report from its own appraiser dated February 10, 1978. It reached the same conclusions as the FDIC report. All concur that the building will have to be demolished.
The court is not concerned with the question of how well Association monitored the mortgage or the activities on the premises such as the revocation of the license. The court is concerned with the action of Association after it went into possession and the inquiry which it then made.
There is no evidence that it inquired of the State Department of Health as to the circumstances, if any, under which *224 the premises could be operated as a nursing home, or as to what could be done with the premises. It basically inquired whether the structure was weather tight and structurally sound.
Although tax assessment practices in Newark have been the subject of litigation in recent years, there is no evidence that it considered that the land was assessed at almost three times the value of the structure and for an aggregate amount $50,000 below the amount of its first mortgage.
The court finds that this is not a situation where Association acted in good faith on a temporary basis in order to secure time to find out what a provident owner should do. The court concludes that a provident owner would have rather promptly gathered the data on tax assessments, licensing condition, structural condition, zoning, neighborhood conditions and the probability of generating any income from the property while in possession, as well as various means to appropriately preserve the property. Based on the record the court concludes all this data could have been available within a week or ten days if the effort had been made to get it. The court finds that this was not done.
The court also finds that a mortgagee in possession, acting as a provident owner, would give notice at least to a holder of a junior encumbrance in the amount held by FDIC before incurring a per diem expense of $120 for which it would seek reimbursement.
The court concludes that Association did not act as a provident owner and denies the application for reimbursement for guard service. Since there is no evidence of any expenditure for boarding the premises up or installing a fire or burglar alarm even since the guard service was terminated, the court does not make any determination in respect to such matters.
NOTES
[1] In Newark v. Sue Corp., supra, the Appellate Division stated that a mortgagee in possession might be liable in negligence to third parties because of the condition of the property.