SEACOAST REAL ESTATE COMPANY, complainant-appellant,

*v.*

AMERICAN TIMBER COMPANY et al., defendants-respondents.

[Argued June 21st, 1920. Decided November 15th, 1920.]

1. A riparian owner is subject to loss by erosion and is supposed to be compensated by gain from accretion; but the erosion is by natural forces without artificial aid and the accretion must also be by natural forces, except as regulated by statute.

2. Erosion along tidal waters extends the domain of the state; accretion narrows the domain of the state and must be limited in accordance with the statutes.

3. A mortgagee in possession cannot charge a mortgagor with money unlawfully spent in an effort to acquire title (contrary to law) to land not covered by the mortgage, from which mortgagor or mortgagee may at once be legally ejected.

4. A mortgagee in possession reclaimed tidal land by repairing a dike of the United States government and filling in between the dike and the fast land.—*Held*, that he could not charge the cost to the mortgagor.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Foster, and reported in *89 N. J. Eq. 293*.

This is a foreclosure. The conveyances are deeds in form but are admitted to be mortgages. The complainants were mortgagees in possession and concede their liability to account. The

only questions argued in this court relate to the accounting. The difficulty arises out of the peculiar character of the mortgaged property. It is situated along the Atlantic ocean and Manasquan river at Manasquan inlet. It was, and is, subject to the inroads of the sea and river.

In 1882 the United States government, in order to make a better outlet for the river and confine it within definite bounds, built crib work and a dike extending from the ocean along the river to fast land at what is called "Stump point," near the mouth of "Short creek." All the waters are tidal waters. At that time there was what is called a lagoon to the north of the dike, lying west of the beach and flowed by the tide. The crib work was partly in the ocean; the dike was largely in the tide water of the inlet and of the river and partly on the sand or sedge land. Between the dike and the sand flowed the tidal water of the river and inlet. The effect of the dike was to make land to the north and the lagoon filled up. In course of time, the dike became much out of repair, the planking was torn off, and the water began to carry away the land back of it and to the north. The government failed to care for the dike. The tide water lying between the land and the dike increased in width, becoming, in 1913, at one point to the west of the crib work, more than sixty feet wide and increasing in width going westward toward "Stump point." The map shows tide water between the dike and the mortgaged premises substantially all the way from the crib to the mouth of "Short creek" opposite "Stump point;" at any rate the tide water separated the dike from the mortgaged premises much of this distance of one thousand feet or more. The mortgagee went into possession in 1912, and in 1914 spent several thousand dollars in repairing the dike. This expenditure proved worthless, as the work was destroyed by severe storms. In 1915, repairs were again made to the dike which seem to have been of more permanent benefit. These cost several thousand dollars. The amount due on the mortgage before the repairs was fifteen thousand ($15,000) dollars. The repairs of the two years, if allowed, add eighteen thousand ($18,000) dollars. The vice-chancellor allowed the cost of the repairs in 1915, but denied the cost of those of 1914.

*Mr. Edmund Wilson* (*Messrs. Durand, Ivins & Carton* and *Mr. John D. McMullin* on the brief), for the complainant.

*Mr. Martin V. Bergen* (*Mr. DeWitt C. Robinson* on the brief), for the defendants.

The opinion of the court was delivered by

SWAYZE, J.

We pass over the questions discussed by the learned vice-chancellor and ably argued by counsel whether the scheme of repairing the government dike was well advised and well planned, and whether the repairs of 1914 were well executed. We pass over also the interesting question whether what was done was merely by way of repairs to the mortgaged premises, or whether it was an improvement, with the sole remark that where the question arises with reference to riparian lands and the effect of the work is to make new land by way of preservation of the present area or by way of filling in, either by human labor or by natural forces, it is difficult to say that what is done is reparation. The addition of new land increasing the area can hardly be other than an improvement. A riparian owner is subject to loss by erosion and is supposed to be compensated by gain from accretion; but the erosion is by natural forces without artificial aid and the accretion except as regulated by statute must be also by natural forces or by lawful acts. Otherwise there would be no limit but the length of the riparian owners' purse. It is for this reason, among others, that the accretion ordinarily must be by imperceptible quantities. Erosion along tidal waters extends the domain of the state; accretion narrows the domain of the state and must be limited in accordance with the statutes. The state has made provision for the artificial extension of the land of the riparian owner. After the decision in *Gough* v. *Bell, 22 N. J. Law 441*, the legislature regulated the acquisition of tidal land, by filling in or docking out, in the Wharf act of 1851. Subsequently, it became important that the matter should be controlled by the riparian commissioners, and in 1891 the Wharf act was repealed and the matter regulated by an amendment of the

Riparian act. *P. L. 1891 p. 216; Comp. Stat. p. 4385 pl. 10.* This amendment enacted that "without grant or permission of said commissioners no person or corporation shall fill in, build upon or make any erection on or reclaim any of the lands under the tide waters of this state." Then follows a provision as to abatement of any purpresture by the court of chancery or by indictment. Section 12 of the supplement of 1869 to the original Riparian act, now printed as *placitum* 19, on page 4389 of the Compiled Statutes, authorizes the riparian commissioners to bring ejectment in the name of the state against persons and corporations trespassing upon or occupying the lands of the state under water or heretofore under water. No riparian grant is shown in this case. The case presents the situation of a wrongful seizure of lands of the state for the purpose of extending the lands of the riparian owner. But for the fact that the repairs were made to a structure placed in tide water by the federal government for the improvement of navigation, the repairs would be a purpresture. Although the federal government had the right to build the dike, the state still retained its title to the submerged soil, subject to the servitude in respect of navigation, created in favor of the federal government by the constitution. *South Carolina* v. *Georgia, 93 U. S. 4; Shivley* v. *Bowlby, 152 U. S. 1; Gibson* v. *United States, 136 U. S. 269.* Citations can readily be multiplied. Whether the work done amounts to a purpresture under the circumstances of this case may be a question. It seems to have been without warrant from the federal government and was an unlawful interference with its property. So far as it resulted in making land of what would otherwise have been tidal land of the state, it subjected the mortgagees in the present case to an action of ejectment. The state's title cannot be acquired in that way. The land remains the property of the state until acquired by the statutory method.

The question presented, therefore, is the narrow one, whether a mortgagee in possession can charge a mortgagor with money unlawfully spent in an effort to acquire title contrary to law to land not covered by the mortgage, from which the mortgagor or mortgagee may at once be legally ejected. It is too plain for argument that the mortgagor can at most only be charged with

lawful expenditures of the mortgagee and cannot be charged with the cost of a tortious attempt, at best, speculative, to acquire land adverse to the state itself. The courts cannot be expected to lend their aid to deprive the government which has created them of its property when seized by force and without right. Whether or not some of the property seized was already upland is of no moment when it comes to the tidal land. The dike was a single whole; like a chain, the failure of a link destroys its value. The cost of the work, whether that of 1914 or that of 1915, is not chargeable to the mortgagor. Let the decree be reversed, with costs, in this court, and the record remitted to the court of chancery for further proceedings in accordance with this opinion.

As to the costs and counsel fees, there is a difficulty. The complainant succeeds in its foreclosure, and to some extent is entitled to costs; it fails on the main question litigated, and ought not to be allowed the additional costs and counsel fees made necessary by the accounting. We are in no position in this court to make an equitable decree as to the costs in the court of chancery. The question can readily be solved by the chancellor.

What we have said controls the decision on the appeal of the Seacoast Real Estate Company, which is not aggrieved by the decree.

No. 5—

*For affirmance*—BERGEN, KALISCH, WHITE—3.

*For reversal*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, MINTURN, BLACK, KATZENBACH, HEPPENHEIMER, WILLIAMS, TAYLOR, ACKERSON—10.

No. 73—

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, BLACK, KATZENBACH, HEPPENHEIMER, WILLIAMS, TAYLOR, ACKERSON—11.

*For reversal*—KALISCH, WHITE—2.