**In re Leonard COOPERSTEIN, d/b/a Lee Lee Coins, Bankrupt.**

**Stanley BLECHER, as Trustee of the Estate of Leonard Cooperstein, Plaintiff,**

v.

**Leonard COOPERSTEIN and Frances Cooperstein, Defendants.**

**Bankruptcy No. 78 B 109.**

United States Bankruptcy Court, S. D. New York.

Nov. 26, 1980.

Siegel, Sommers & Schwartz, New York City, for bankrupt; Leonard Schwartz, New York City, of counsel.

Tedd Blecher, New York City, for trustee.

Stanley Blecher, Trustee.

## MEMORÀNDUM OPINION

BURTON R. LIFLAND, Bankruptcy Judge.

This proceeding,[1] one of a series marked by acrimony, was commenced by the trustee in bankruptcy to compel defendants, Leonard and Frances Cooperstein, to turn over property characterized as fixtures that they had removed from their former personal residence, a real property asset of the estate. The events leading up to the removal of property, and the subsequent attempt to justify removal and continued retention, is summarized.

An involuntary petition in bankruptcy was filed against Leonard Cooperstein d/b/a Lee Lee Coins on January 20, 1978. Both prior and subsequent to the filing of the petition, defendants resided at 507 Gallows Hill Road, in Cranford, New Jersey, (an apt street name in light of the developments that followed). Although conflicting representations were made by plaintiff's and defendants' respective attorneys, concerning the defendants' continued possession of the personal residence, it appears that defendants were permitted to continue in possession of the personal residence (prior to the Trustee's anticipated sale of the residence), in exchange for a promise by defendants to make payments on the first mortgage, taxes, fuel bills, and other carrying charges. In addition, defendants agreed to maintain the personal residence in good condition.

When defendants were delinquent in making the payments described above, and permitted the personal residence to fall into disrepair, the trustee commenced a turnover proceeding to compel defendants to relinquish possession of the real estate. During the course of this proceeding, defendants' attorney represented in court:

"... We have no intention of damaging the house. We haven't damaged the house... There is a leaking roof, and if we have another rainstorm, there is (sic) going to be damages. We are not going to damage it. It is an act of God."

Based upon such assurances of tranquility and harmony, and the defendants' renewed promise to render delinquent mortgage and tax payments, this Court permitted the defendants to remain in possession of the personal residence for several additional months.

It was during this period, according to the plaintiff, that defendants evidenced a determined malevolent intent to damage and despoil the personal residence. The defendants' course of conduct in damaging the residence included within its ambit the removal of certain property which is the subject of the instant proceeding. A catalog of the unpleasantries follows:

1. Mrs. Cooperstein purchased a Hot Point portable dishwasher in December, 1978, to replace a nonfunctioning built—in

---

1. Since the filing took place in 1978, the provisions of the 1898 Bankruptcy Act govern this case and not those of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2683.

washer (Tr. 50).[2] The new dishwasher had wheels, which Mrs. Cooperstein removed in order "to slip" the dishwasher under the counter (Tr. 62). The unit was "hooked up" to water pipes in the back and installed in a space custom cut in the kitchen counter for the original dishwasher. Because some space remained, her husband (the defendant, Leonard Cooperstein), took a piece of wood, stained it to the same color as the cabinet, and placed it in the gap (Tr. 62). The dishwasher was placed flush with the kitchen cabinet (Tr. 64). Water for the dishwasher did not come from the sink as is common with portable units, but from plumbing behind the dishwasher (Tr. 62). The defendants tore out this dishwasher, leaving in its place an unsightly gaping hole.

2. A friend of the Coopersteins, Richard Manrodt, testified that he "loaned" the defendants a compressor for a central air conditioning system. This compressor rested on cinder blocks set on a concrete base located at the exterior of the house (T. 59). This compressor was attached to copper tubing which in turn led through a hole in the foundation of the house, into the house, where it was attached to the air conditioner, the blower, and other parts of the central air–conditioning system (Tr. 18–19). The compressor was in place and all the pipes were connected when plaintiff's agent inspected the personal residence in March, 1980. (T. 59–61).

Defendants removed flare nuts connecting the compressor to the copper tubing, disconnected the wiring, and removed the compressor from the personal residence.

3. Defendant Frances Cooperstein testified that she installed lighting fixtures in the personal residence approximately four years ago. Another witness for the defendants testified that these lighting fixtures were screwed into an electric box, then wired and "nutted together" to make electrical contact, and that to remove them, they would have to be unscrewed (Tr. 22–23). This witness further testified that under New Jersey law, lights are required where a house is offered for sale (Tr. 25).

There were several types of lighting fixtures involved. The dining room chandelier was of Tiffany style, had plain inserts and painted silhouettes with crystal hanging from the bottom. The hallway fixtures were of like decor. The bedroom fixtures were hand–painted enamel–like candelabras. Another lighting fixture was a replica of a chrome airplane. The bathroom fixture was brass and black with about six or eight bulbs (Tr. 65).

Defendants removed all the light fixtures leaving capped wires exposed (Tr. 29).

4. Panelling and a plywood floor from a partially remodelled basement were ripped out.

5. Defendants tore out "carpetry" from the hallway and the living room.

6. A gas grill that had been built into a patio was taken, leaving bricks that formerly anchored it, strewn about.

Thus, the current deplorable condition of the premises, pictorially depicted in the submitted evidence, is in sharp contrast to a relatively well–maintained dwelling turned over to the trustee's stewardship at the inception of the bankruptcy proceeding.

To rectify the situation, plaintiff commenced an adversary proceeding, Bankruptcy Rules 701 *et seq.*, to compel defendants to turn over the above items to the estate. Pending a ruling from the Court, the trustee obtained a temporary restraining order enjoining defendants from disposing, conveying, or transferring any of these items. During the course of these proceedings, on August 18, 1980, defendants tendered to plaintiff in a heap–2 × 4 studs, wall panelling, a plexiglass shower door, and barbeque grill with related pipes, all of which had been removed from the personal residence. Defendants contest the trustee's right to the balance of the property.

---

**2.** Page references are derived from the transcripts of August 5, 1980, and of August 19, 1980. References to the transcript of August 5, 1980 are designated (T. ); references to the transcript of August 19, 1980 are designated (Tr. ).

Whether defendants must also return the air conditioner, dishwasher, and lighting fixtures is the question that must be resolved. This determination turns on whether this property is to be construed as fixtures as plaintiff contends, or personalty, as defendants contend. If the property is characterized as fixtures, then title to them merged with the personal residence, and they are property of the estate. As a defense, defendants claim that title to this property belongs to Frances Cooperstein and Richard Manrodt, and is not, and never became property of the estate because the bankrupt, Leonard Cooperstein, never owned it.

## DISCUSSION

■ Since rights to property affixed to realty are governed by the law of the situs of the realty, New Jersey law applies. 4A *Collier on Bankruptcy* § 70.20 at 283 (14th Edition 1978) and see cases cited therein. However, since there is a paucity of cases in New Jersey pertaining to household fixtures (as distinguished from trade fixtures) this Court must look to and cites other jurisdictions that apply the same definitional formula of what constitutes a fixture.

One commentator wrote that the law of fixtures is in "irreconcilable conflict" among the jurisdictions and even within a given jurisdiction.[3] Although this is an accurate description, some common themes do emerge.

The classic test of a fixture follows a three-pronged formula: "First, the articles must be actually annexed to the realty; second, they must be applied to the purpose for which that part of the realty to which they were annexed was appropriated; third, they must be annexed with the intention to make a permanent accession to the freehold ...", *Ames v. Trenton Brewing Co.*, 56 N.J.Eq. 309, 38 A. 858, 861 (1897) *aff'd* 57 N.J.Eq. 347, 45 A. 1090 (1898). *Westinghouse Broadcasting Co., Inc. v. Di-*

*rector, Div. of Taxation,* 141 N.J.Super. 301, 358 A.2d 203 (App.Div.1976) (emphasizing institutional and intention test).

Although the cases are in conflict as to the degree of actual annexation required, in the instant case all the items were annexed to the realty, and in fact, they were firmly anchored so as to meet the more stringent tests. For instance, the dishwasher was securely connected to water pipes in the back, and not to the sink faucet, as is common with portable units. Plaintiff's witness, a licensed real estate salesman testified, "... it was built right into the cabinets. It was affixed. There was no question it was not a portable ..." (Tr. 27). The air conditioning compressor was similarly connected to copper tubing and wiring, which was routed through a hole in the foundation, and eventually connected to the rest of the central air–conditioning system. The following testimony was adduced from Richard Manrodt, defendants' witness:

"Q. Does the tubing eventually lead into the house?

A. Yes, it goes through a hole in the foundation."

\* \* \* \* \* \*

"Q. It's not fixed anywhere in the house?

A. It's fixed all the way to your air conditioner."

(Tr. 18–19). The lighting fixtures were also anchored in the real estate. Defendants' witness testified that the lighting fixtures were screwed into an electric box, then wired and "nutted together" to make electrical contact. (Tr. 22–23). In fact, to remove the light fixture, defendants found it necessary to hire a professional electrician (Tr. 59).

The air conditioner, dishwasher, and lighting fixtures also fulfill the second requirement of a fixture (adaption to the use to which the realty is devoted). This re-

---

**3.** Magielnicki, "Toward a Satisfactory Fixture Definition for the Uniform Commercial Code", 55 Cornell Law Review 477, 489 (1977).

quirement is sometimes known as the "institutional doctrine".[4]

 Although it is natural to apply the "institutional doctrine" in the realm of trade fixtures–e. g., baking equipment is naturally adapted to the use of a bakery when installed therein, the "institutional doctrine" applies to household fixtures as well. A personal residence is devoted to the function of providing its occupants a comfortable and livable environment. Lighting fixtures, heating equipment, sinks, dishwashers, washing machines, air conditioners, and carpeting, all further the livability of the home, i. e., they further its central purpose as a place of repose and comfort. Although one may argue that air conditioners and dishwashers are luxuries, and are not essential for furthering the central purpose of a home, one must take into account the fact that:

> "The law relating to fixtures has slowly and gradually changed as times have changed. Various household appliances, not formerly held to be fixtures, have become so in this 'built–in' era. But the major changes are probably the result of an awareness of the fact that the luxuries of a given generation become the necessities of the next."

*Strain v. Green,* 25 Wash.2d 692, 172 P.2d 216 (1946). Thus, the definition of fixtures is not static, but changes with time and circumstances.

Brown's learned treatise, *The Law of Personal Property* (3rd ed. 1975) states at 531:

> "At one time light fixtures were held personalty on the ground that they were the functional equivalent of lamps and candles. These cases cannot be considered authoritative today when electric

lighting is the accepted accompaniment of every modern home.

> \* \* \* \* \* \*

> A central air–conditioning system would be a fixture just like a central heating system; a sufficiently built–in window–type unit ought to pass with the real estate as well, but an easily removable window air conditioner probably is still personalty."

*Id.* at 531–532.

The air–conditioning compressor at issue here was a functional part of the central air–conditioning system, which as the authority above points out, is a necessary concomitant of a modern home. The dishwasher, similarly, was part of a functional kitchen unit containing the sink and kitchen cabinets, all of which were encased in a continuous formica counter. The dishwasher even matched the decor of the refrigerator. Its removal left the kitchen visually as well as functionally incomplete. In addition, New Jersey law, which requires lighting fixtures in every home offered for sale, offers strong evidence of the essential nature of lighting fixtures to the functioning of this personal residence.

Furthermore, commentators note that community standards may be utilized to determine what will constitute a functionally complete personal residence. In commenting on *Strain v. Green, supra,* one writer noted:

> This court is on obviously practical ground in determining that household furnishings, once unusual and clearly personal property, can in time become widely and commonly used to such an extent that a house without them would not be complete according to community standards. This approach, clearly presents

---

4. Cases involving conditional vendors: title to trade fixtures are heavily cited by plaintiff and defendants. Those cases, based mainly upon the Uniform Conditional Sales Act, N.J.R.S. 46:32–14, add an additional requirement to the common law formulation of the "institutional doctrine", a material injury standard. If chattels cannot be severed without "materially injuring" the premises, they will be construed as fixtures. New Jersey and Pennsylvania uniquely define "material injury" in functional or economic terms.

Those cases formulation of the "institutional doctrine" are inapposite to the present proceeding which does not concern trade fixtures or conditional sales contracts. Moreover, the formulation of a "material injury" standard is questionable in light of the Uniform Commercial Code, 9–313(5).

the ultimate question of whether, under all the facts and circumstances, the ordinary reasonable man of the community would consider the article in question as part of the real estate.

22 *Wash.L.Review* 140 (1947).

*"The Law of Personal Property"* at 517, Brown goes further than a community standard, and enunciates a "reasonable person" test. Thus, what is or is not a fixture depends upon what "the ordinary person would intend or expect under the circumstances of the given case."

An expert witness, an appraiser of houses in the Cranford community, testified in response to defendants' attorney's question on cross–examination:

> "Q. Have you sold houses in the Cranford area that have been bare, just bare houses, outside of lets say, refrigerators, *dishwashers*, drying machines?[5] [Emphasis added]
>
> \* \* \* \* \* \*
>
> Q. Had there been conditions or situations where sellers have instructed you that they are going to remove certain items at the time of closing when they sell the house?
>
> A. In fifteen years of being in the business there has been only one house..."

The above testimony adduced is strong evidence that Cranford homeowners would not consider their homes complete for sale without the inclusion of dishwashing, lighting, or air–conditioning equipment.

Further testimony reveals that a personal residence similar to the one at 507 Gallows Hill Road, (in good condition) would bring a sales price of $85,000–$95,000. If one were to apply a "reasonable person" standard, one can only conclude that a "reasonable person", even in these inflationary times, would consider that a residence in this sales bracket would be incomplete without a dishwasher, air–conditioning unit, and other modern conveniences.

Lastly, the air conditioner, dishwasher, and lighting fixtures fulfill the requirement of the third part of the tripartite test ("the party making the annexation intends a permanent accession to the freehold"). The satisfaction of the last prong has gained increasing importance in recent times. "Intent is the cardinal inquiry in determining whether a chattel has become a fixture". *Kane v. Timm*, 11 Wash.App. 910, 527 P.2d 480, 481 (1974). An objective manifestation of intention rather than secret intention controls. *Strain v. Green, supra* 172 P.2d at 220–221.

The mortgage, to which the personal residence was subject, offers evidence that title to the property in question in this proceeding, was intended to merge with the real estate:

> "Now, therefore, Mortgagor for the better securing of the monies mentioned in said bond, with interest thereon ... has granted, does by these presents grant, bargain, sell, release, convey and confirm to Mortgagee ... all that certain tract ... of land ...
>
> Together with the buildings and other structures, now existing or hereafter erected on said mortgaged premises; *all improvements, fixtures, furnishings, equipment, and without limitation, any personal property*, now owned or hereafter acquired by the mortgagor, *attached to or used* in connection with the mortgaged premises ... it being the *intention* of the mortgagor that all such personal property, now owned or hereafter acquired, shall constitute part of the realty." (Emphasis added)

The clear import of these words is that the mortgagor and mortgagee agreed that any and all "personal property" "attached to or used in connection with" the personal residence "shall constitute part of the realty".

Moreover, and more importantly, Frances Cooperstein and Richard Manrodt now assert their secret intention was to

---

**5.** It is interesting to note that defendants' attorney by his question unintentionally conceded that even "bare" houses contain refrigerators, *dishwashers*, and drying machines. The dishwasher is therefore placed on a par with these other household necessities.

retain title to their property. Their assertions are rebutted by their conduct. They firmly implanted, bolted, and connected the property at issue into existing pipes, plumbing, wiring, and other internal arteries of the personal residence. This can only be described as a manifestation of intention that the property remain with the personal residence. Furthermore, they annexed property which by its nature is incidental to the efficient functioning of the household. The dishwasher, air conditioner, and lighting fixtures are functional "household fixtures". Mrs. Cooperstein's and Richard Manrodt's conduct therefore evidenced an intention that their property enrich and complete the personal residence.

In sum, the plaintiff has established through clear and convincing evidence[6] that the property constituted fixtures. Case law concerning household fixtures supports this view. In *Kane v. Timm, supra*, an exhaust fan in a wall constructed to replace a window, and a kitchen sink and cabinet combination were held to be fixtures. *Mahoney v. Beebe*, 334 Mass. 165, 134 N.E.2d 126 (1956), held that two chandeliers of sentimental value, which were easily removable from the ceiling, nevertheless became fixtures. The court commented:

> Whether the chandeliers remained personalty or became realty when they were set up by Mrs. Beebe in her home presumably to make it more livable while she occupied it, with no thought of vacating or removing the chandeliers, was a question of fact, and we think there was no error in finding that they had been incorporated into and part of the realty.

*Id.* 134 N.E.2d at 128.

Similarly, in *Strain v. Green, supra* 172 P.2d at 217, among the property at issue were a large and beautiful crystal chandelier in the center of the dining room and adjoining rooms. The distinctive feature of these lights was their ornamentation by a great number of pendants of imported crystal glass. Applying an objective intention test, the court held the chandeliers to be fixtures.

In conclusion, the air–conditioning equipment, dishwasher, chandeliers, and other lighting fixtures removed from the premises constituted fixtures. Consequently, title to the fixtures merged with the real estate, an asset of the estate, and the items must be returned to the estate.

It is so ordered.

---

**6.** A turnover proceeding which may require coercive methods to compel an individual to return property to an estate, holds a plaintiff to a higher standard of proof than he is required to fulfill in an ordinary civil action. 2 *Collier on Bankruptcy* § 23.10 at 573 (14th Ed. 1976).