**In re JACKSON TANKER CORPORATION, Debtor.**

**JACKSON TANKER CORPORATION, Plaintiff,**

v.

**HARTZ MOUNTAIN INDUSTRIES, INC., and WTW Realty, Inc., Defendants.**

**Bankruptcy No. 85 B 10126.**
**Adv. No. 85–5763A.**

United States Bankruptcy Court, S.D. New York.

Feb. 6, 1987.

Crummy, Del Deo, Dolan, Griffinger & Vecchione, A Professional Corp., Newark, N.J., for Jackson Tanker Corp. by David Hyman.

Waters, McPherson, McNeill, P.A., Secaucus, N.J., for Hartz Mountain; by Laurence Z. Kotler.

Ravin, Sarasohn, Cook, Baumgarten & Frisch, West Orange, N.J., for Damin Aviation Corp. & Lincoln Harbor Heliport, Inc.; by David N. Ravin.

Kraft & Hughes, Newark, N.J. and New York City, for W.T.W. Realty Co., Inc. by John B. Hall.

BURTON R. LIFLAND, Chief Judge.

The instant adversary proceeding was brought to determine, as between the fee owner of real property and a tenant of the former mortgagee-in-possession, title to certain improvements made to commercial

property located in Weehawken, New Jersey ("the Premises"). Although the tenant, WTW Realty, Inc. ("WTW") concededly knew that its landlord, the former mortgagee-in-possession, Hartz Mountain Industries, Inc. ("Hartz") did not have title to the Premises, WTW proceeded to install between $300,000 and $400,000 worth of improvements ("the Improvements") to the Premises.

In doing so, WTW gambled on its assumption that the mortgagor, Jackson Tanker Corp. ("Jackson"), the debtor herein, would be unable or unwilling to redeem its mortgage from previously commenced foreclosure proceedings, which would result in Hartz becoming the fee owner. By proceeding on this assumption, WTW placed itself in its present vulnerable position.

Parties' Contentions

Jackson asserts that it is settled New Jersey real property law that upon a mortgagor's redemption of real property, the improvements knowingly made by a mortgagee-in-possession or by one whose title is derivative of the mortgagee-in-possession's, without the mortgagor's consent, inure to the mortgagor's benefit. In other words, Jackson asserts that WTW's rights rise or fall with those of Hartz. In addition, Jackson points out that pursuant to its lease with Hartz, WTW expressly agreed that any improvements would be property of Hartz and acknowledged that Hartz' status was only that of mortgagee-in-possession.

WTW contends that Jackson had abandoned the property, that it was in a state of total disrepair when Hartz took possession of it, and that the lease between Hartz and WTW provided that if WTW were dispossessed from the property for any reason, WTW could remove fixtures and other property from the premises. WTW asserts that the Improvements cost approximately $400,000, that Jackson had actual or constructive notice of the lease, WTW's possession and Improvements, and that WTW relied upon Jackson's abandonment of the Premises in making the Improvements. Finally, it is WTW's position that it never intended the Improvements to become fixtures and that under New Jersey law, the transformation of a chattel into a fixture is a question based upon the parties' intent, the manner of affixation and the ease of removal.

At an extensive trial, the court received voluminous evidence, both documentary and testimonial, concerning the specific types of improvements and methods of affixation to the property. Having considered this evidence, and the arguments and papers of counsel for the various parties, the court concludes that the title to the Improvements in dispute rests with Jackson Tanker Corporation.

## I. Factual and Procedural Background

### A. The Property and Mortgage

On July 29, 1976 Jackson became the fee owner of certain real property located in Weehawken, New Jersey designated on tax map of the Township of Weehawken as Lots 2, 2A, 3 and 3A in Block 34C. Jackson was and is a wholly-owned subsidiary of Seatrain Lines, Inc. ("Seatrain"), also a Chapter 11 debtor.

In December 1977 Seatrain sought to have a warehouse constructed on the subject property. An elaborate financing arrangement was entered into whereby the land upon which the building was to be constructed was leased by Jackson to an entity eventually known as Scottsdale Associates, Inc. ("Scottsdale"). As part of the financing arrangement, General Electric Credit Corporation ("GECC") acquired a mortgage on the property and Scottsdale maintained an interest in the building which in a separate proceeding was determined to be an equitable mortgage. Shortly before the filing of its Chapter 11 case in February, 1981, Seatrain defaulted on its lease payments to Scottsdale, thereby causing Scottsdale to default on the mortgage payments it was required to make to GECC. GECC commenced foreclosure proceedings in the Superior Court of New Jersey, Chancery Division, Hudson County in April, 1981. Prior to the conclusion of the

foreclosure proceedings, Hartz purchased and took by assignment both GECC's mortgage and Scottsdale's equitable mortgage, thereby consolidating both mortgage liens with one lienholder. Thereafter, Hartz took possession of the subject property as mortgagee-in-possession and entered into a lease agreement with defendant WTW dated December 16, 1982 (the "Lease Agreement") and a modification agreement to the Lease Agreement dated January 17, 1984 (the "Modification Agreement").

The Modification Agreement between Hartz and WTW provided that WTW had no obligation to pay rent while it occupied the premises. Pursuant to the terms of the Modification Agreement, Hartz agreed to construct for WTW, at another location on Hartz's property, a new building, which was identical to the leased premises except that the new building would have masonry walls. WTW was not required to pay rent until 90 days after a certificate of occupancy on the new building was issued. The Modification Agreement further provided that as between WTW and Hartz all improvements made on the premises would belong to Hartz. Jackson was not a party to the Lease or the Modification Agreement.

During the course of the foreclosure proceedings, a judgment of foreclosure was entered in the Superior Court of New Jersey, including a determination that Jackson's fee interest was subordinate to the interest of GECC in the Weehawken property. At no time did the New Jersey Court eliminate Jackson's statutory right to redeem its fee interest in the property.

B. Default Proceedings and Settlements

On January 30, 1985, immediately prior to the anticipated foreclosure sale at which Hartz was positioned to acquire the fee interest owned by Jackson, Jackson filed a Chapter 11 petition with this Court. On May 1, 1985 Jackson filed a complaint in the instant adversary proceeding against Hartz and WTW seeking judgment, in relevant part, (1) directing Hartz to prove the validity, extent and priority of its alleged liens on the Weehawken property and (2) declaring that upon redemption of the Weehawken property from the liens of Hartz, all interests of Hartz and WTW therein would terminate and WTW would have no further rights in the Weehawken property.

Although it participated at the trial, WTW did not formally appear by counsel at these proceedings and the court entered a judgment of default against it. WTW thereafter moved to vacate the judgement of default. WTW's motion was denied by Order and Judgment dated August 29, 1985.

A settlement of the first phase of the trial between Jackson and Hartz was entered into on June 27, 1985 ("the Settlement"). The Settlement fixed Hartz's liens on the Property at $3,000,000 and provided that unless Jackson redeemed the Property for that sum within sixty days, the automatic stay would terminate and Hartz would be free to proceed to foreclose its liens in that amount, plus interest accruing after August 26, 1985. In a link to the Settlement the court approved a Joint Venture Agreement, by which it was agreed that following redemption of the Hartz liens, Jackson would convey the property to a venture (subsequently named "ATIR Company") in which Jackson is one of the co-venturers and retains an equity interest.

The Settlement (which was memorialized by a Judgment of this Court dated July 8, 1985) further provided that this court retained jurisdiction over Hartz and Jackson for the purpose of resolving the disputes over ownership of any improvements on the Property. The parties stipulated that New Jersey law would govern this court's determination of the improvements issue. On the last day to redeem, August 26, 1985, Jackson paid the $3,000,000 to Hartz. Pursuant to the Joint Venture Agreement, Jackson simultaneously transferred the property to ATIR Company.

Thereafter, Jackson, as participant in the new joint venture, sought actual physical possession of both the Property and the Improvements claiming that both Hartz and WTW's rights were extinguished when

Jackson redeemed. WTW responded to Jackson's application for possession by seeking the right to remain on the property for a reasonable period of time and further seeking an order that any improvements it had made to the property could be removed by WTW at the time it vacated.

WTW had entered into a number of subleases with related entities known as Lincoln Harbor Realty, Inc. ("Lincoln Realty"), Lincoln Harbor Heliport and Damin Aviation Corporation. Lincoln Realty had also entered into a sublease with Resortsair, Inc. ("Resorts") for a portion of the premises. After redemption of the property by Jackson, Resorts moved to vacate the Jackson/Hartz Settlement. The court, in an order dated January 15, 1986, approved a pendente lite settlement of the disputes raised by the Resorts motion. In the Resorts settlement, certain issues relating to the prior Hartz/Jackson settlement and Damin and Resorts' occupancy of the property were resolved through the execution and court approval of new leases between ATIR and Damin and ATIR and Resorts, as well as the discharge or denial of all related motions and cross motions.

The sole remaining issue to be determined is ownership of the Improvements. WTW conceded at trial that for purposes of this determination, its interest was identical to that of Hartz. This is because WTW's rights are derivative of Hartz's and also because, pursuant to the Modification Agreement, Hartz became responsible for moving WTW from the Property and constructing a duplicate building, at no expense to WTW.

This court retained jurisdiction over the issue of the disposition of the subject improvements by stipulation of Hartz and Jackson dated June 27, 1985 as incorporated in the judgment of this Court dated July 8, 1985. At that time, (a) the real estate was the property of the debtor, Jackson, (b) both Jackson and Hartz, and not WTW asserted ownership rights to the improvements, (c) WTW was a tenant in possession of the improvements, and (d) WTW was in default in this adversary proceeding.

When Jackson paid Hartz the redemption price and conveyed its fee interest to ATIR pursuant to the court-approved Joint Venture Agreement (a) Jackson continued to retain an equity interest in both the real estate and in the disputed improvements by virtue of its equity participation in ATIR, (b) WTW remained in default, (c) WTW filed its own application seeking rights in the improvements, and (d) WTW signed a new lease with ATIR expressly recognizing that, all of its rights with respect to its old lease with Hartz were terminated and that, subject to rulings of this court in this adversary proceeding, all improvements, fixtures and other items on the subject property were owned by the new landlord, ATIR.

Both the Lease Agreement and the Modification Agreement between WTW and Hartz specifically acknowledge that Hartz's rights with respect to the property were limited to that of a mortgagee-in-possession. Thus, neither Hartz nor WTW were under a mistaken belief as to who owned the property at the time the subject improvements were made.

### C. Nature of the Improvements Made

In late 1981, Seatrain vacated the Property and GECC took possession of the premises as mortgagee-in-possession. At the time the building was constructed it had heat, electric, lights, plumbing, bathrooms, exterior doors, and partitioned office. The testimony established that in the summer of 1982, when GECC was still in possession and prior to Hartz' acquisition of the GECC and Scottsdale mortgages, an inspection by Jackson's president revealed these features of the building to be in good working order.

By the time Hartz took possession of the property, however, the building had been extensively vandalized and become quite dilapidated. There were holes in the building structure. There was no electricity and the building's water pipes had burst. In fact, the building was fit for little use other than the place of sojourn it had become for a number of hobos and their families.

None of the condition testimony was substantively contradicted by any party.

The improvements made by WTW restored the structural integrity of the building which was subsequently used by that company as a heliport with a hanger, commercial office space and maintenance facilities. These improvements, at least in theory, are detachable, in "erector set" fashion. Almost none of the improvements at issue are unique to the heliport business; rather, they are features typical of almost any building used in a commercial enterprise.

D. The Undisputed Improvements

At trial, the parties stipulated into evidence a list of improvements that were in dispute. Jackson contended that the "real issue" in the case was ownership of hangar doors and of the fueling and pumping system that had been installed. Although Jackson did not abandon its claim of ownership to all of the other improvements, Jackson conceded that it considered the two air compressor units and controls to be personalty, and did not intend that Hartz leave them. Ownership of the related piping must be decided by this court. Furthermore, Jackson made no claim to one TV and four air-to-ground radio antennae, the fence surrounding the perimeter of the property, and the guard house at the gate entrance. In addition, Jackson agreed that WTW could remove in a careful manner with due care given to patching of holes, three Damin Aviation signs, all curtains, drapes and shades, the portion of the wind cone and assembly which sits on the roof, and the beacon located in the same place.

Also at trial, the defendants agreed to leave the underground pipes and concrete foundation which are a part of the heliport's fuel system.

E. The Disputed Improvements and the Effect of their Removal

1. Interior Building Improvements

Defendants seek to remove the plywood wallboards that make up the interior wall of the hanger building and the drop and "hung" ceilings in the office areas of the building. Removal of the walls would expose the exterior metal skin of the building and deprive the building of a surface on which to attach piping, electrical wires and outlets. Removal of the ceilings would leave exposed the piping, duct and roof areas of the building.

Defendants also seek to remove fixtures in the building's lavatories, kitchens and work stations. Removal of the lavatory fixtures (e.g. toilets and sinks) would leave piping extruding from the walls and holes in the floors and walls of the lavatories. Removal of the kitchen fixtures (e.g. sinks, stove, refrigerator, etc.) would similarly result in the exposure of plumbing, pipes and wiring. Removal of the fixtures in the work stations (e.g. electrical sockets) would leave wiring exposed and holes in the interior wall where they had been attached.

WTW would also remove the wall to wall carpeting and twenty office doors in the commercial office section of the building. Such removal would expose the building floor and leave holes in the walls of rooms and offices to which the doors are presently attached.

The defendant seeks to remove industrial, office, hanger, exit and emergency light fixtures throughout the building. The hanger and emergency lights are bolted into the walls and roof of the building. Removal of the ceiling lights that hang in the grid work of the drop ceilings would leave holes in the ceiling. Removal of all these fixtures would leave electrical wiring exposed and would leave the building in darkness.

Finally, WTW wants to remove two electrical circuit breaker panels from the building interior. The panels are bolted on or screwed into the walls and if removed there would be no electrical power in the building.

2. Exterior Building Improvements

Having stripped the interior of the building from floor to ceiling, the defendants would then remove improvements from the exterior of the building. Such improvements include an exterior, garage door,

exterior entrance doors, thermopane windows, hanger doors, obstruction lights and flood lights located on the roof of the building. The removal of the exterior doors and windows would leave open holes in the building walls. In the case of the hanger doors, which were installed after the complete restructuring of the north end of the building, these holes would be eighty feet wide and over twenty feet high.

Removal of the obstruction lights, which are bolted to the building and serve to help pilots on takeoff and landing, would leave the building more vulnerable to approaching helicopters and leave wires running to the building's central electrical system exposed on the surface of the building. Removal of the flood lights used to illuminate the helicopter landing pad and the florescent lights used to illuminate the building exterior would leave holes in the building roof and side and leave electrical wiring exposed on these surfaces.

### 3. Fueling, Wiring and Piping Systems

Defendant WTW also seeks to remove the Heating, Ventilation and Air Conditioning Systems ("HVAC") and other support systems which supply fuel, air, heat and electricity to the building. The wiring and piping for the buildings air compressors, heating and air condition pumps run throughout the building and are clamped to the building surfaces or housed in duct work attached to the building. Removal of the wiring, piping and duct work, as well as the pumps, heaters, electrical transformer and timer, and fans that make up the support systems would leave holes in the building surfaces and leave the building without the benefit of these elementary systems.

WTW would also like to remove the aircraft fueling system which serves the heliport. The system includes two twenty thousand gallon tanks installed partially underground outside the building, as well as piping, controls and fuel pumps, which are bolted and cemented into concrete. As noted above, WTW agreed at trial to leave the concrete foundation and underground pipes. Removal of this system would leave large deep ditches in the ground where its components are located. WTW, it should be noted, did not pay for the installation of this fueling system. A sublessee of the defendant financed the construction of the system pursuant to its sublease. Mr. Alvin Trenk, a Manhattan heliport operator, credibly testified that the common practice in the heliport business is for fueling systems to remain the property of the landlord or owner, even if installed by the tenant.

### 4. Improvements on the Premises

Finally, the defendant seeks to remove the landing lights installed on the heliport landing strip. The electrical wiring for the lights is connected to the building's electrical system. The lights themselves are attached to concrete curbing spiked into the landing strip surface. Removal of these fixtures would leave holes in the landing strip surface and leave electrical wiring exposed.

### F. The Intent of the Parties

WTW contends that as between it and Hartz, the parties intended that WTW remove the disputed improvements when Hartz constructed the new building. There was insufficient evidence adduced at trial to establish this intention. In any event such an intention is irrelevant to the issue of ownership as between Jackson and Hartz.

The Lease and Modification Agreements are silent as to ownership upon removal of the disputed improvements. No inventory list was drawn up when WTW and Hartz negotiated their lease. Under the terms of both documents, the site improvements made by WTW were to become Hartz's property when Hartz built the new building for WTW. WTW knew when it entered into the lease with Hartz that Hartz was only a mortgagee-in-possession. Despite this knowledge, WTW neither sought nor received permission from Jackson, the fee owner, to install the disputed improvements.

## II. *Discussion of Law*

### A. The Court has Jurisdiction over the Subject Matter and the Parties.

This Court obtained subject matter jurisdiction over the property of the debtor, Jackson, upon the filing of the Chapter 11 Petition on January 30, 1985. 28 U.S.C. § 1334. The service of the Summons and Complaint upon Hartz and WTW and the subsequent filing of motions by WTW with respect to the property and improvements brought all relevant parties before the Court.

Jurisdiction was retained over the issue of the disposition of the subject improvements by stipulation of Hartz and Jackson dated June 27, 1985 as incorporated in the judgment of this Court date July 8, 1985. This was affirmed by WTW in its lease with ATIR entered into during a partial settlement of this action which was approved by the Court.

Jackson's conveyance of the property to ATIR pursuant to the court-approved joint venture, did not remove subject matter jurisdiction from this Court since Jackson owned the property as of the commencement of the Chapter 11 case and continued to retain a legal and equitable interest in the joint venture after the conveyance. This is a core proceeding. 28 U.S.C. § 157(a), 157(b)(2)(E), 157(b)(2)(O). Thus, this Court continues to exercise its jurisdiction over the debtor's property and the administration of the estate. 28 U.S.C. § 154; 28 U.S.C. § 1334; 11 U.S.C. § 541.

### B. Title to the Improvements Follows Title to the Land

Rights to property affixed to realty are governed by the law of the situs of the realty. *In re Cooperstein,* 7 B.R. 618, 621 (Bankr.S.D.N.Y.1980). Thus in this case, New Jersey law applies. Defendants contend that the New Jersey law of trade fixtures governs this dispute, and that under that law it retains title to the improvements. This Court believes that the New Jersey law of mortgages is more appropriately applied to the issues contested here.

The distinction is not fatal, for under either rule of New Jersey law, title to the improvements rests in Jackson Tanker Corporation.

### 1. The General Law of Improvements.

Under the general law of improvements, it is well settled that improvements to realty are considered a part of the real property and ownership of the improvements follows title to the land. *Chard v. Chard,* 104 N.J.Eq. 443, 445, 146 A. 184, 185 (E & A 1929). *See, generally, Tiffany, Real Property,* § 231, pp. 535–36 (1912).

As a corollary of this principle, it is equally well settled that where an individual knowingly makes improvements on the land of another, without the latter's fault or consent, an equity court will not permit the former to remove or obtain reimbursement for such improvements, notwithstanding the benefit conferred upon the landowner. *Laible v. Ferry,* 32 N.J.Eq. 791, 801 (1880).

While there are exceptions to the above cited rules, the exceptions invariably involve an innocent party who makes improvements under a mistaken belief that he or she is the absolute owner of the property. *See, e.g., Riggle v. Skill,* 9 N.J.Super. 372, 74 A.2d 424 (1950), *affirmed,* 7 N.J. 268, 81 A.2d 364 (1951). *See also, Donovan v. Smith,* 88 A. 167 (N.J.1913) (purchaser at foreclosure sale who made improvements under mistaken belief as to ownership of property). Moreover, the mistake must be an honest one and not the result of any culpable negligence on the part of the party incurring the expense. *Brick Township, Ocean County v. Vannell,* 55 N.J.Super. 583, 151 A.2d 404 (1959); *Riggle v. Skill, supra.*

### 2. The Fee Owner's Right to Improvements

#### a. New Jersey Mortgage Law

A similar result occurs for ownership of improvements under New Jersey *mortgage* law. The starting point is the well established proposition that since a mortgage is

only security for a debt, title and possession of the mortgaged property remain with the mortgagor, subject to divestment in the event of a default and sale by the mortgagee in satisfaction of its lien. *Guttenberg Savings & Loan Association v. Rivera,* 85 N.J. 617, 626, 428 A.2d 1289, 1294 (1981); *Sears, Roebuck & Co. v. Camp,* 124 N.J.Eq. 403, 1 A.2d 425 (1938). *See, generally, Cunningham and Tischler,* "Law of Mortgages", 29 N.J. Practice § 4 at 18–23; *Id.,* 30 N.J. Practice at § 191 at 21 (1975 ed. and Supp.1985).

Two corollary principles of law with respect to improvements on mortgaged premises have necessarily developed from this general proposition. First, it is firmly established that a mortgagor who makes improvements to mortgaged premises subjects those improvements to sale in satisfaction of the mortgagee's lien in the event of a default under the mortgage. *See, Mutual Life Insurance Co. of N.Y. v. Dowden,* 3 A. 351 (N.J.Ch.1885). Similarly, where a mortgagee-in-possession, or anyone who takes possession of the property under his authority, makes improvements on the property without the consent of the mortgagor, he does so at his peril and upon redemption of the property by the mortgagor, the mortgagee-in-possession has no right to seek allowance for same. Were the rule of law otherwise, a mortgagee-in-possession could so substantially improve a property as to effectively deprive a mortgagor of the power of redemption. *See, Clark & Smith v. Smith,* 1 N.J.Eq. 121, 138 (1830) and *Seacoast Real Estate Co. v. American Timber Co.,* 92 N.J.Eq. 219, 223, 113 A. 489, 490 (1920) (mortgagee-in-possession's claim for reimbursement of improvements made to a dike on title lands during the course of its possession of the property disallowed).

As with the general law of improvements, an exception has been said to apply where mortgagee-in-possession makes improvements under an honest, mistaken belief as to absolute ownership of property. *Bluestone Building and Loan Association v. Glasser,* 117 N.J.Eq. 392, 176 A. 314 (1935); *Vanderhaise v. Hugues,* 13 N.J.Eq.

410 (1861); *Freichnecht v. Meyer,* 39 N.J.Eq. 551, 562 (1885); *see, generally, Cunningham and Tischler,* "Law of Mortgages", 30 N.J. Practice § 195 at 43–44 (1975 ed. and Supp.1985).

The case at bar falls squarely within the principles of the above cases. There can be no argument that Hartz or WTW acted under a mistaken belief as to ownership. The terms of the Lease and Modification Agreement between Hartz and WTW expressly acknowledge the fact that Hartz did not have title to the subject property and that its interest was only that of mortgagee-in-possession. Hartz did not act as a "prudent owner" in permitting WTW to make improvements on the Weehawken property before Hartz had acquired title to same. Hartz's acceptance of risk is further illustrated by the fact that it encouraged such improvements by WTW on Jackson's property notwithstanding its intentions to relocate WTW and to build a new building for WTW at another location off of the premises. Thus, under applicable New Jersey law, given the circumstances under which the subject improvements were made, these improvements must inure to the benefit of the Jackson estate.

The disputes to be decided by the Court are solely between Hartz and Jackson, since the defendants have acknowledged in their pleadings, agreements and testimony that Hartz, and not WTW, has the primary economic interest in the disposition of the improvements. As a matter of law, WTW may have no greater rights to the improvements than Hartz. Since Hartz was acting as landlord to WTW solely in its capacity as mortgagee-in-possession of the Weehawken property, WTW's rights with respect to this property are also governed by the aforecited principles of New Jersey mortgage law, since Hartz could not convey any greater property interest to WTW in the Weehawken property than it itself held. *See, Xerox Corp. v. Listmark Computer Systems,* 142 N.J.Super. 232, 361 A.2d 81 (1976). WTW was found to have no further rights in the property at the time of the entry of the default judgment

in this case (*see* Default Judgment, dated July 5, 1985), which was further affirmed when this court denied Damin's motion to vacate the default judgment (see Order Denying Motion to Vacate Default Judgment, dated August 29, 1985), where it was specifically stated that at the time of Jackson's redemption of the Hartz mortgage, WTW's rights with respect to the Weehawken property would terminate.

### b. *The New Jersey Law of Trade Fixtures*

The defendants claim that the New Jersey law of trade fixtures governs the disposition of the improvements is incorrect. It is true, that as between a landlord and its tenant, the law of trade fixtures, which looks to the intention of the parties for a determination of ownership rights to fixtures, may be applicable. However, since neither Hartz nor WTW was a tenant of Jackson, the concept of "trade fixture" has no application in the instant case. *See, In Re Park Corrugated Box Corp.,* 249 F.Supp. 56, 59 (D.N.J.1966) and *Crane v. Brigham,* 11 N.J.Eq. 29 (1855), *accord Greenwald v. Graham,* 100 Fla. 818, 130 So. 608 (1930), ("[T]he fact that chattels annexed to land by a mortgagor may be what are commonly known as trade fixtures does not affect the right of the mortgagee to them as part of the security.") *and Johns v. Gillian,* 134 Fla. 575, 184 So. 140 (1938). Even the cases relied upon by Hartz and WTW expressly note that while trade fixture law is a governing principle in the landlord-tenant relationship [Hartz-WTW] (where the subject is a matter of bargain and intention), it is not at all applicable to owner-mortgagee situations [Jackson-Hartz]. *See also, Uttinger v. Koopman,* 46 N.J.Super. 443, 450, 134 A.2d 824, 828 (1957) (where intentions were relevant only within a landlord-tenant relationship).

■ Here, WTW leased property from Hartz, a mortgagee-in-possession, and expressly acknowledged that Hartz did not hold title to the property. The intentions of Hartz and WTW with respect to the improvements are thus irrelevant in the context of Jackson's redemption of the property from Hartz. Moreover, there was no privity of contract between Jackson and WTW. Hartz and WTW simply cannot bind Jackson upon a self-serving agreement to which Jackson is not a party. *See, e.g., Wehrle v. Landsman,* 23 N.J.Super. 40, 46, 92 A.2d 525, 528 (1952) (no privity of contract between landlord and subtenants or assignees of its tenant). Not only is the assent to installation of the improvements by a mortgagee-in-possession to its tenant not binding upon the fee owner, but even assent given by an owner at the time of installation is not binding upon his subsequent purchaser of the fee. *Smyth Sales Corp. v. Norfolk B & L Association,* 116 N.J.L. 293, 299, 184 A. 204, 207 (1936).

Thus, whether it was Hartz and WTW's intention that some or all of the improvements which are at issue in this case were to be removed and transported is of no moment since the intentions of those parties cannot bind the fee owner. As between Jackson and Hartz [mortgagor and mortgagee], the issue is not what the intentions of Hartz and WTW were at the time the items in issue were placed on the property, or whether the items constitute trade fixtures as opposed to ordinary fixtures. Nor is the issue whether Hartz or WTW could remove the items from the property and cosmetically restore the property to the way it was prior to construction of the improvements. Rather, the sole issue to be decided by the Court with respect to each of the improvements is whether the item is imbued with sufficient elements of permanency as opposed to those qualities which would require that the item be deemed mere personalty.

■ Even were WTW correct, however, and the New Jersey law of trade fixtures did apply; title to the Improvements would remain with Jackson. None of the Improvements described above are "trade fixtures". The kitchen and lavatories, the office doors and carpeting, the elementary support systems, etc. are not "absolutely essential to the use of the [heliport] for the purposes for which it was built." *Uttinger v. Koopman,* 46 N.J.Super. 443, 134 A.2d

824 (1957). Without *any one* of the contested Improvements there would still be a heliport, although there would scarcely be a building, much less a heliport were the court to allow the defendant to remove *all* the Improvements.

To determine whether a particular improvement was a "fixture" which would remain with the land, or a "personalty" which could be removed by the installer, the "traditional test" in New Jersey mandated that intention was the dominant factor. An improvement becomes a fixture under this test when the party making the improvement intends it to become a permanent addition to the freehold. Intention was inferred from an analysis of the nature of the improvement, the character of the improver's rights in the freehold, the manner in which the improvement was installed, and the purpose for which the improvement was made. *In re Park Corrugated Box Corp.*, 249 F.Supp. 56, 58 (D.N.J.1966).

The current and applicable New Jersey test is known as the "institutional doctrine", where the main consideration is whether the item is essential to the completeness of the structure or its present or adapted use. This doctrine typically requires an analysis of the character of the structure to which the fixtures are attached, and the purpose and the manner in which the fixtures are attached. *Uttinger v. Koopman*, 46 N.J.Super. 443, 448–49, 134 A.2d 824, 827 (1957).

The test to be applied when the "institutional doctrine" is used, has been defined as follows:

"When a chattel which, clearly, is permanently essential to the completeness of a structure, having regard to the character of that structure and the functioning of it in the use for which it was obviously designed, is actually, purposely and lawfully affixed to and into the structure, it becomes, in our opinion, a part of the realty; and if the severance of it will prevent the structure from being used for the purposes for which it was erected *or for which it has been adapted,* then the article is not severable without material injury to the freehold. . . .

*Smyth Sales Corp. v. Norfolk B & L Association*, 116 N.J.L. 293, 298, 184 A. 204, 206 (1936) (emphasis added).

The concept of whether an item is essential to the completeness of the *structure* of its present or adapted use is not to be confused with whether a particular item may or may not be peculiar to a particular *business* operation. Thus, in the instant case, while an HVAC system may not be tailored to or peculiar to the helicopter *business,* it is essential to the *structure* as adapted for use as a heliport.

WTW, with full knowledge that its rights in the property were no greater than those of Hartz, the mortgagee-in-possession, chose to *adapt* the building and premises to use as a heliport. Thus under the institutional doctrine, as set forth in *Smyth Sales Corp.* the modifications made, e.g. replacement of one wall of the building with hanger doors and installation of special systems (e.g. lighting and fuel) are fixtures under New Jersey law.

To the extent that any aspect of "intention" is a requirement under this doctrine, it is an *objective* manifestation of intention rather than self serving court statements which apply. *In re Cooperstein,* 7 B.R. 618, 623 (Bankr.S.D.N.Y.1980). What is or is not a fixture may also depend upon what "the ordinary person [would] intend or expect under the circumstances of the given case." *Brown, The Law of Personal Property* (3d Ed.1975), at 517. *See also,* 22 Washington L. Review 140 (1947), and *In re Cooperstein,* 7 B.R. 618, 623 (Bankr.S.D.N.Y.1980). If one were to apply a "reasonable person" standard, one can only conclude that a "reasonable person" would consider that an industrial or commercial building would be incomplete without windows, doors, heat, electric, air-conditioning, lights and other conveniences. *In re Cooperstein,* 7 B.R. 618, 623 (Bankr.S.D.N.Y. 1980).

**C.** **The Improvements Made by WTW are Fixtures**

The Improvements made by WTW are obviously "essential to the completeness"

of the building and premises in which they were incorporated. Removal of exterior doors and windows, for example, would leave holes in the walls of the building. Removal of the hanger doors [1] alone would leave the entire north side of the building open to the elements.

Furthermore, while some of the contested fixtures could be removed without damage to the structural integrity of the shell of the building, such removal would render the building unfit for *the use to which it had been adapted.* A building without electricity, heat, air conditioning and lights [2], doors and windows [3], kitchen and lavatory fixtures [4], and carpeting [5], is, of course, not fit for any use at all. A building, moreover, without such fixtures and without landing lights, obstruction lights and a fuel system, is particularly unfit for use as a heliport.

The court holds that the interior and exterior improvements, the elementary support systems, and the improvements to the premises described above are permanent fixtures. All of the items claimed by defendants are essential to the completeness of the structure both as a commercial building and as a heliport.

The fact that these fixtures could be removed easily is of little relevance. New Jersey courts have specifically rejected such a test to determine whether an improvement is a fixture or mere personalty. *Smyth Sales Corporation v. Norfolk B & L Association,* 116 N.J.L. 293, 296–97, 184 A. 204, 206 (1936). WTW does not have the option of removing the Improvements and restoring the building to its original condition. The Improvements, essential to the completeness of the building have become incorporated into it. Jackson's title to these Improvements arose upon installation. *Fortescue v. Bowler,* 55 N.J.Eq. 741, 38 A. 445 (1897).

### D. The Equities Do Not Favor Hartz or WTW

It is noteworthy that no injustice would result by refusing to permit Hartz or WTW to remove the improvements from the Weehawken property. Both Hartz and WTW acted with full knowledge of the risks involved. At the time that WTW made improvements to the Weehawken proeprty, it had *no* contractually expressed expectation that it would own the improvements made, but, indeed, contracted to relinquish any rights it might have had to Hartz, in exchange for Hartz' obligation to duplicate these improvements at a new location. Thus, WTW could not conceivably be harmed by its loss of the improvements.[6]

Similarly, Hartz could have had no reasonable expectation of ownership in the

1. In as much as installation of these doors required the reconstruction of one entire end of the building and removal would leave the north end of the building open to the elements, the hanger doors are fixtures. *See, e.g. Provident Mutual Life Insurance Company v. Doughty,* 125 N.J.Eq. 442, 6 A.2d 184 (Ch.1939), *and Fortescue v. Bowler,* 55 N.J.Eq. 741, 38 A. 445 (Ch.1897), *accord, Stockton v. Tester,* 273 S.W.2d 783 (Mo. App.1954).

2. The components of the elementary support systems (e.g. piping, duct work, wiring, transformer, tanks) for fuel, heat, air and electricity are fixtures. *See, e.g. Patitucci v. Drelich,* 153 N.J.Super. 177, 379 A.2d 297 (Law Div.1977), *Smythe Sales Corp. v. Norfolk B & L Association,* 116 N.J.L. 293, 184 A. 204 (E & A 1936) *and In re Cooperstein,* 7 B.R. 618 (Bankr.S.D.N.Y.1980).

3. The exterior doors and windows are fixtures. *See e.g. Stockton v. Tester,* 273 S.W.2d 783, (Mo. App.1954).

4. The kitchen and lavatory improvements are fixtures. *See, e.g. Coleman v. Sweeney,* 11 N.J. Super. 352, 78 A.2d 313 (Ch.1951), *In re Cooperstein,* 7 B.R. 618 (Bankr.S.D.N.Y.1980), *and Uttinger v. Koopman,* 46 N.J.Super. 443, 134 A.2d 824 (App.Div.1957), *accord Kane v. Timm,* 11 Wash.App. 910, 527 P.2d 480 (1974).

5. The carpeting is a fixture. *See e.g. In re Cooperstein, supra, accord Kane v. Timm, supra.*

6. The fact that WTW and Hartz have apparently redefined their relationship with respect to these improvements between the date of the filing of this complaint and this judgment, is of no relevance to this court since those agreements are voluntary and made after the fact of the original agreements between the parties which define the relationships herein.

improvements made to the Weehawken property; it entered the property as mortgagee in possession, knowing it did not have title to the property and that its mortgagor and junior lienholders had a right of redemption. *See, City Federal Savings & Loan Association v. Jacobs,* 188 N.J.Super. 482, 486, 457 A.2d 1211, 1213 (1983); *Kirkeby Corp. v. Cross Bridge Towers, Inc.,* 91 N.J.Super. 126, 219 A.2d 343 (1966). Hartz is clearly presumed to know the law. Despite this knowledge, Hartz permitted and encouraged WTW to make improvements to the Weehawken property. Apparently, Hartz chose to speculate that Jackson would not redeem the property and that Hartz would become the owner. In such circumstances, Hartz must be deemed to have assumed any risks associated with such speculation and the improvements must necessarily be surrendered to Jackson.

As important is the fact that Hartz and WTW were in possession of the Weehawken property for over 2½ years free of use and occupancy payments to the fee holder Jackson. Hartz has no economic expectation of receiving rent since WTW paid no rent to Hartz during this period. Indeed the cost of the improvements to WTW was approximately equivalent to rent. In addition, upon Jackson's redemption of the property from Hartz, Hartz received a payment of $3,000,000 for its liens. Insofar as Hartz' own appraiser, Mr. William J. Stack, II, valued the property at $1.2 million, the excess above that amount paid to Hartz by Jackson more then compensates it for the cost of the improvements.

III. *Legal Conclusion:*

Rights to property affixed to realty are governed by the law of the situs of the realty. *In re Cooperstein,* 7 Bankr. 618, 621 (Bankr.S.D.N.Y.1980). Thus, in this case, New Jersey law applies. Defendant WTW contends that New Jersey law of trade fixtures governs this dispute, and that under that law it retains title to the improvements. This Court believes that the New Jersey law of mortgages is more

appropriately applied to the issues contested here. Under either rule of New Jersey law, however, title to the improvements rests in Jackson Tanker Corporation.

The Debtor is directed to submit an appropriate order in accord with this decision.